UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| LAURA HOFFMAN<br>3807 Milford Ave.<br>Parma, OH 44134<br><br>and<br><br>LINDA HERMAN<br>3428 Euclid Heights Blvd.<br>Cleveland Heights, OH 44118<br><br>Plaintiffs,<br><br>v.<br><br>MICHAEL C. O'MALLEY,<br>JENNIFER DRISCOLL,<br>GREGORY MUSSMAN,<br>JOANNA WHINERY, and<br>LISA WILLIAMSON<br>(in their official and personal capacities)<br>The Justice Center, Courts Tower<br>1200 Ontario Street, 9th Floor<br>Cleveland, Ohio 44113<br><br>Defendants. | Case No.:<br><br>Judge:<br><br>**COMPLAINT WITH JURY DEMAND** |

## I.  Introduction

1.      Approximately one month after Defendant Michael O'Malley replaced Timothy McGinty as Cuyahoga County Prosecutor, the Prosecutor's office went to the press with a politically charged story claiming that 76 sexual-assault cases had been mishandled by the office's juvenile division, and, as *Cleveland.com* reported it, wrongly "sat dormant on the desks of assistant prosecutors for months and, in some cases, years." Defendants made Plaintiffs Linda Herman and Laura Hoffman scapegoats in this story, which was apparently manufactured to portray Defendant O'Malley in a

better light than his predecessor and to create a pretext for the discriminatory termination of Plaintiffs' employment.

2. Former Assistant Prosecutor Duane Deskins, who was chief of the juvenile unit under McGinty, has denied that these cases were mishandled, maintaining that his unit "did an aggressive job" of handling its case load. Beyond conclusory allegations, the public statements from Defendant O'Malley's office on this story reveal little more than reasonable differences between administrations regarding how to classify cases and allocate limited resources.

3. Regardless of whether these cases were actually mishandled, Ms. Herman and Ms. Hoffman were relatively inexperienced, low-level employees, who followed their supervisors' reasonable orders, and could not have been responsible for any such failure.

4. The Defendants nevertheless told *Cleveland.com* that Ms. Herman and Ms. Hoffman were two of three attorneys in the office who "handled the bulk of the cases" and were "asked to resign" as a result, "after each had a disciplinary hearing in O'Malley's office." These statements, reported at *Cleveland.com* and in *The Plain Dealer*, among other local and national media outlets, were intended to hold Ms. Herman and Ms. Hoffman out as responsible for the allegedly mishandled files and constitute defamation per se under Ohio law.

5. The Prosecutor's office has since admitted in its submissions to the Equal Employment Opportunity Commission ("EEOC") relating to this matter that it could only assign blame to Ms. Herman on four of the 76 allegedly mishandled cases, and Ms. Hoffman on only two of them.

6. The Ohio Department of Job and Family Services Office of Unemployment Compensation has since found, "after a review of the facts," that both Ms. Herman and Ms. Hoffman were "terminated without just cause."

7. Ms. Hoffman was born with optic nerve atrophy, a genetic condition that severely impairs her vision. At the time of her termination, she was in the process of negotiating over reasonable

accommodations for her disability after the new administration had informed her that it would not grant her the same accommodations that the previous administration had.

8. Ms. Herman was 52 years old at the time of her termination, a 2014 law-school graduate who was approximately 20 years older than her peers in the office.

9. Other Assistant Prosecutors with similar experience levels as Ms. Herman and Ms. Hoffman who were just as involved in the alleged misconduct, but were younger and not disabled, were either not disciplined in any way or allowed to keep their jobs at the office.

10. Defendants' selection of Ms. Hoffman and Ms. Herman as scapegoats for Defendants' media coverage was due, in substantial part, to Ms. Hoffman's disability and Ms. Herman's age.

11. This is an action for damages against Defendant O'Malley and Assistant Prosecutors Lisa Williamson, Gregory Mussman, Joanna Whinery, and Jennifer Driscoll, in their official and personal capacities, alleging claims for defamation, and discrimination and wrongful termination of Plaintiffs' employment in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.A. § 12101 et. seq. ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C.A. § 621, et. seq. ("ADEA"), and Ohio Revised Code §§ 4112.02(A) and 4112.14.

## II. Parties

12. Plaintiff Laura Hoffman is and at all relevant times was a U.S. citizen and a resident of the City of Parma in Cuyahoga County, Ohio.

13. Plaintiff Linda Herman is and at all relevant times was a U.S. citizen and a resident of the City of Cleveland Heights in Cuyahoga County, Ohio.

14. Defendant Cuyahoga County, is and, at all times relevant herein, was a political subdivision of the State of Ohio, organized and existing under the laws of the State of Ohio, with its principal offices located in Cleveland, Ohio.

15. Defendant Michael O'Malley is the duly elected Prosecutor of Cuyahoga County and a

resident of Cuyahoga County, Ohio. This lawsuit is being brought against him in both his official and personal capacities.

16.     Defendants Lisa Williamson, Gregory Mussman, Joanna Whinery, and Jennifer Driscoll are Assistant Prosecuting Attorneys in the Office of the Cuyahoga County Prosecutor and residents of Cuyahoga County, Ohio. This lawsuit is being brought against each of them individually in both their official and personal capacities.

17.     Defendant Cuyahoga County is vicariously liable for the conduct of its employees, Defendants Michael O'Malley, Lisa Williamson, Gregory Mussman, Joanna Whinery, and Jennifer Driscoll.

### III. Jurisdiction and venue

18.     This Court has federal-question jurisdiction over this action under 28 U.S.C. § 1331 for the claims raised under 42 U.S.C.A. § 12101 et. seq. and 29 U.S.C.A. § 621, et. seq., and supplemental jurisdiction over the claims raised under Ohio law.

19.     This Court has jurisdiction over the Defendants because they are residents of Ohio and work for a local government office whose conduct is at issue in this litigation, the Office of the Cuyahoga County Prosecutor, located in Cuyahoga County, Ohio.

20.     Venue is proper in this Court because the acts upon which the claims are based occurred in Cuyahoga County. The defamation, discriminatory treatment, and wrongful termination all took place in Cuyahoga County and the damages were and are suffered by the Plaintiffs, Cuyahoga County residents, while in Cuyahoga County.

21.     Plaintiffs timely filed charges with the EEOC in connection with this matter and have exhausted their administrative remedies under the ADA and the ADEA. Plaintiffs' right-to-sue letters are attached as **Exhibit 1** to this Complaint.

## IV. Facts

**A.     Laura Hoffman and Linda Herman attained employment with the Cuyahoga County Prosecutor's office and excelled in their positions under Tim McGinty's administration.**

22.     Ms. Hoffman is a white female with a medically diagnosed visual impairment that substantially limits her in major life activities and qualifies as a disability under the ADA. She obtained a bachelor's degree in political science, *cum laude*, from the University of Notre Dame in 2004, a Juris Doctor from Ave Maria School of Law in 2007, an LLM in law and government from American University Washington College of Law in 2009, a second LLM in child and family law from Loyola University Chicago School of Law in 2010, and a doctor of juridical science (S.J.D.) in health law and policy from Loyola in 2012.

23.     In July of 2002, Ms. Hoffman was featured in a *Cleveland Plain Dealer* article about her "dreams of becoming a lawyer and refus[al] to let her disability block her." The article quotes her then-co-workers in the Parma Law Department as to her status as a "terrific colleague," who is "always so upbeat [and] professional."

24.     Ms. Hoffman was hired as an Assistant Prosecuting Attorney at the Cuyahoga County Prosecutor's office in June of 2014 and was shortly assigned to a permanent position in the juvenile justice unit as explained fully below.

25.     Ms. Hoffman shortly established a reputation as a reliable and diligent attorney with integrity. Until Defendant O'Malley took over as Prosecutor, Ms. Hoffman never received any disciplinary actions and received positive evaluations from her supervisors at all times prior to her termination.

26.     Ms. Herman is a 53-year-old black female. She obtained a bachelor's degree in fine arts, *summa cum laude*, from Cleveland State University in 2008, and a Juris Doctor from Cleveland-Marshall College of Law at Cleveland State University in 2014.

27. Ms. Herman was hired as an Assistant Prosecuting Attorney at the Cuyahoga County Prosecutor's office in February of 2015, and began her career in the juvenile justice unit.

28. She worked in the intake section of the juvenile justice unit for six months before rotating to the traffic courtroom for approximately five months.

29. In January of 2016, Ms. Herman rotated into a magistrate's courtroom and began prosecuting misdemeanors and low-level felonies.

30. In November 2016, Ms. Herman began working in a judge's courtroom for the first time and started prosecuting serious juvenile offenses.

31. She shortly established a reputation as a reliable and diligent attorney with integrity.

32. Ms. Herman never received any disciplinary actions and received positive, if not excellent, evaluations from her supervisors at all times prior to her termination.

33. In addition to handling her own caseload, Ms. Herman also trained student law clerks, observed and conducted victim interviews as requested by more experienced Assistant Prosecuting Attorneys, and served as the "on-call" Assistant Prosecuting Attorney two to three times a month.

34. Ms. Herman was often sought out by her peers to assist on challenging cases because of her ability to connect and build a rapport with victims and witnesses.

35. Ms. Herman also volunteered to be part of a Sexual Assault Review Team (SART) within the juvenile justice unit at the Prosecutor's office. Ms. Herman's supervisor at the time, Robin Belcher, proposed the juvenile justice SART program in late 2015, hoping to form a group of Assistant Prosecuting Attorneys who would be specially trained to prepare and prosecute juvenile sex crimes in cooperation with the Cleveland Police Sex Crimes Unit. One of the tasks that this SART group undertook was to review a series of "cold" police files that the Sex Crimes Unit had forwarded to the Prosecutor's office, requesting confirmation that these cases could be closed. By summer of 2016, the juvenile justice unit's SART program had been effectively abandoned due to the unit's

6

inability to dedicate sufficient resources to sustain it.

**B.    Ms. Hoffman was properly afforded reasonable accommodations for her disability under the previous administration.**

36.    When Ms. Hoffman first began working for the Cuyahoga County Prosecutor's office in June of 2014, she informed Beverly Dean, then human resources director at the office, of her disability and that she would require reasonable accommodations in order to perform the essential duties of an Assistant Prosecuting Attorney.

37.    On June 14, 2014, Ms. Hoffman sent Ms. Dean an ADA reasonable-accommodation request form along with a letter from Dr. Andreas Marcotty of the Cleveland Clinic's Cole Eye Institute explaining Ms. Hoffman's optic-nerve atrophy and the limitations it imposed on her ability to work.

38.    The Cuyahoga County Prosecutor's office, under Mr. McGinty, properly cooperated with Ms. Hoffman to provide her with disability-assistive technology, such as a text enlargement program and a portable closed-circuit television.

39.    With such reasonable accommodations for her disability, Ms. Hoffman excelled as an Assistant Prosecuting Attorney.

40.    Ms. Hoffman was hired in the juvenile justice unit's intake section, assisting more experienced prosecuting attorneys with their courtroom dockets and litigation.

41.    Ms. Hoffman was soon given her own docket starting with managing the juvenile traffic court docket. She also managed hundreds of juvenile delinquency cases in court rooms with judges and magistrates, and she served as the "on-call" Assistant Prosecuting Attorney two to three times a month..

42.    On January 20, 2016, Ms. Hoffman met with Ms. Dean, at Ms. Dean's request, to discuss Ms. Hoffman's satisfaction with regard to the job and her disability accommodations. Ms. Hoffman had been advised by supervision that she was one of the next prosecutors in line to rotate downtown Cleveland to the adult division and expressed concern about this to Ms. Dean in this

meeting.

43.    Ms. Hoffman felt that she would not be able to effectively serve as an Assistant Prosecuting

Attorney in the adult unit because adult cases required presenting to juries with the ability to convey

and pick up on visual cues from a jury necessary to effectively prosecute cases.

44.    Ms. Hoffman requested a permanent placement in the juvenile justice unit of the Cuyahoga

County Prosecutor's office based on her knowledge that several other Assistant Prosecuting

Attorneys had also been permanently placed in the unit and only handled juvenile cases.

45.    Accordingly, Ms. Hoffman asked Ms. Dean for the reasonable accommodation for her

disability to permanently work in juvenile justice unit, and the office ultimately granted this request.

**C.    The new administration immediately announced big changes to the management of the juvenile justice unit.**

46.    In November of 2016, the citizens of Cuyahoga County elected Defendant Michael

O'Malley to replace Timothy McGinty as County Prosecutor.

47.    By the end of 2016, the leadership of the Cuyahoga County Prosecutor's office, including the

juvenile justice unit, had been completely replaced.

48.    Defendant O'Malley chose Assistant Prosecuting Attorney Defendant Greg Mussman to

lead the juvenile justice unit.

49.    On January 3, 2017 Defendant Mussman held a meeting with all the Assistant Prosecuting

Attorneys in the juvenile justice unit in order to introduce himself. During this meeting, Defendant

Mussman stated at least three times that he was difficult to work with, and announced that all of the

Assistant Prosecuting Attorneys who had been permanently assigned to the unit would either have

to rotate to the adult division or apply for another position within the Prosecutor's office.

**D.    The new administration refused to provide reasonable accommodation for Ms. Hoffman's disability.**

50.    On January 3, 2017, the same day that Defendant Mussman held his introductory meeting,

8

he asked Ms. Hoffman to meet with him in his office.

51.     During this meeting, Defendant Mussman formally acknowledged that Ms. Hoffman had previously been given accommodation for her disability. He reiterated, however, that the new administration would not make the same accommodations and that she would either have to rotate to the adult unit or apply to another unit of the Prosecutor's office.

52.     Defendant Mussman did not allow for the possibility that Ms. Hoffman would be permitted to remain in the juvenile unit.

53.     On January 6, 2017, Ms. Hoffman met with Defendant Mussman again, where they further discussed her employment options in light of her disability. Ms. Hoffman told Defendant Mussman that there were a few other units within the Prosecutor's office where she felt that she could be reasonably accommodated with her disability. Defendant Mussman responded immediately by stating that there were no openings in the units she suggested. Defendant Mussman then told Ms. Hoffman to make a written record of her request and email it to the new human resources director, Jason Sobczyk, and First Assistant Prosecuting Attorney, Defendant Lisa Williamson.

54.     On January 8, 2017, Ms. Hoffman emailed Mr. Sobczyk, and copied Defendant Mussman and Defendant Williamson. In this email, Ms. Hoffman explained her disability and that she had been granted various reasonable accommodations by the previous administration. Ms. Hoffman further explained that by refusing her placement as a permanent prosecutor in the juvenile division, the new administration was effectively denying her the primary accommodation that she had been previously granted.

55.     On January 9, 2017, Defendant Mussman asked for a meeting with Ms. Hoffman at his office, where Ms. Hoffman's primary supervisor, Defendant Joanna Whinery, was also present. Defendant Mussman was visibly angry and confronted Ms. Hoffman about her email to Mr. Sobczyk. Defendant Mussman informed Ms. Hoffman that he viewed this email as a personal attack

9

on him due to its statement of concern over the possibility that Ms. Hoffman would be denied a reasonable accommodation that had already been granted by the previous administration. Mussman further declared that the ADA did not require him to make such reasonable accommodations for Ms. Hoffman. In response, Ms. Hoffman attempted to explain ADA requirements and that it in fact does require employers to make reasonable accommodations for disabled employees who can otherwise perform their job-related duties.

56.     Defendant Mussman then attempted to discredit Ms. Hoffman's disability by comparing her to other Assistant Prosecuting Attorneys who were willing to work in the adult unit with disabilities for which the Prosecutor's office did not provide accommodations.

57.     Ms. Hoffman left the meeting feeling distressed because her disability, which had previously been accommodated without issue, had apparently become a concern for the Prosecutor's office.

58.     On January 10, 2017, Ms. Hoffman emailed Mr. Sobczyk the ADA forms and letter that she had previously sent to his predecessor, Ms. Dean, in 2014, as well as Ms. Dean's reply from January 28, 2016 stating that Ms. Hoffman's request for reasonable accommodation was granted for permanent placement in the juvenile justice unit. Mr. Sobczyk shortly replied by email stating that he would get back to her ASAP about arranging a meeting.

59.     By January 26, 2017, Mr. Sobczyk had still not arranged a meeting with her, so Ms. Hoffman sent Mr. Sobczyk a follow-up email, to which Mr. Sobczyk responded that he was still looking for the information that Ms. Hoffman had previously sent to him. He later scheduled a meeting for February 2, 2017 to discuss her disability accommodations and subsequently rescheduled it for February 6, 2017.

60.     In the weeks leading up to this meeting, Ms. Hoffman's workload was also increased such that she was receiving substantially more assignments than her peers in the intake unit, and an unprecedented and especially difficult overnight schedule, including an assignment of three

overnight shifts over a period of five days.

**E.    The new administration imposed unrealistic and unworkable expectations on Ms. Herman in an effort to justify her discriminatory termination.**

61.    On January 13, 2017, Defendant Mussman informed Ms. Herman that she was assigned to take over the docket in Judge Floyd's courtroom for the juvenile justice unit.

62.    Assistant Prosecuting Attorneys generally receive a two-week notice of such rotation to allow them to clear their current dockets—notify victims, issue subpoenas, make notes for the next prosecutor, etc.—and familiarize themselves with their new dockets. Additionally, any pending trials scheduled for the two weeks following the rotation were typically handled by the previous Assistant Prosecuting Attorney who worked on the cases, as opposed to the new Assistant Prosecuting Attorney who would undoubtedly be unfamiliar with the pending cases.

63.    However, for undisclosed reasons, Defendant Mussman gave Ms. Herman only a one week deadline to bring her old docket current and to familiarize herself with her new docket in Judge Floyd's courtroom. Ms. Herman was further assigned to personally manage five trials scheduled on her newly assigned docket in Judge Floyd's courtroom during the first week of her rotation.

64.    As Ms. Herman was given insufficient notice of the rotation to Judge Floyd's courtroom, and with the unorganized state of the new docket, Ms. Herman was forced to work without lunch or other breaks, work on weekends, and work an additional 30 hours of overtime in one week to prepare for her trials—expectations that other younger assistant prosecutors were not forced to endure in similarly situated positions.

**F.    The new administration wrongly accused Ms. Hoffman and Ms. Herman of mishandling sexual-assault cases.**

65.    On January 24, 2017, in the midst of Ms. Hoffman's loss of her reasonable accommodation and the imposition of new unmanageable work responsibilities on Ms. Herman, Defendant Mussman called an unscheduled meeting of the juvenile justice unit to announce that approximately

11

60 sexual assault cases had been wrongly uncharged.

66.     Defendant Mussman angrily instructed the staff to find any uncharged sexual assault cases and report them to the administration immediately. Defendant Mussman also stated that, "No one is going to get in trouble, we just need those files."

       **1.**       **Defendants wrongly accused Ms. Hoffman of mishandling four cases.**

67.     As instructed, Ms. Hoffman checked her desk and found two sexual-assault files from 2014 when she had worked in the intake unit. Both cases were previously designated as inactive after Ms. Hoffman discussed them with her intake supervisor at the time, Robin Belcher.

68.     Ms. Hoffman had been instructed to use the inactive designation for files when there was a problem with a case—most commonly, the lack of cooperation from the victim—and it could not move forward until the Prosecutor's office obtained additional information. Once the files were designated as inactive, as instructed by Ms. Hoffman's supervisor, the case no longer appeared in the electronic list of files assigned to Ms. Hoffman.

69.     When Ms. Hoffman rotated out of the intake unit in 2015, these cases should have been transferred under the juvenile justice unit's procedures to different Assistant Prosecuting Attorneys.

70.     Ms. Hoffman did not know that these two cases remained assigned under her name due to an IT or clerical error which was not disclosed to her.

71.     Upon discovering this discrepancy, Ms. Hoffman immediately informed the intake supervisor, Defendant Joanna Whinery.

72.     Defendant Whinery assured Ms. Hoffman that no disciplinary action would be considered for Ms. Hoffman's possession of the old, inactive cases because Ms. Hoffman brought them to Defendant Whinery's attention.

73.     On February 1, 2017 Defendant Mussman asked Ms. Hoffman for a meeting in which Defendants Williamson and Whinery also attended.

74.     The three Defendants questioned Ms. Hoffman about her handling of four sexual assault cases.

75.     Ms. Hoffman stated that she had already filed charges on one of the cases, and she was in the process of filing charges on another. These two cases had recently come under Ms. Hoffman's purview due to her recent reassignment to the intake unit. The remaining two cases were the same files that Ms. Hoffman had found on inactive status and brought to Defendant Whinery's attention.

76.     Defendants Mussman and Whinery used an intimidating and accusatory tone with Ms. Hoffman during this meeting, but Ms. Hoffman believed that she had answered all their questions satisfactorily.

77.     On February 6, 2017, Ms. Hoffman finally had a meeting with Mr. Sobczyk to discuss reasonable accommodations for her vision disability. Mr. Sobczyk concluded the meeting by indicating that once Ms. Hoffman provided the Prosecutor's office with new documentation of her disability, she might still be required to leave the juvenile justice unit for permanent placement elsewhere.

### 2.     Defendants wrongly accused Ms. Herman of not reporting cases that were part of the failed SART program.

78.     After Defendant Mussman's January 24, 2017 meeting regarding allegedly uncharged cases, Ms. Herman did not believe that she had any uncharged sexual-assault cases, as she had not worked in the intake unit for more than a year.

79.     Ms. Herman refocused her attention on managing her overloaded docket and the unexpected trials that Defendants assigned to her.

80.     On January 26, 2017, Ms. Herman stayed at work late to search her files for additional information, unrelated to the allegedly mishandled sexual-assault cases, that Mussman had requested from all members of the juvenile unit. At this time, she discovered four cold-case files that she had previously reviewed as part of the juvenile justice unit's SART program.

81.     Ms. Herman immediately advised the office manager Terri Lee of these files the next morning on January 27, 2017, and told Ms. Lee that the cases were not considered "uncharged" cases, but rather, police reports on cold cases that had been reviewed as part of the SART program.

82.     Ms. Herman gave the four police reports to Defendant Whinery, along with her notes, and drafts of non-prosecution letters for two of the files that were clearly unsuitable for prosecution, as determined by her former supervisor Ms. Belcher. The other two reports involved cases that would require further follow-up with and guidance with the SART team supervisors, to the extent the program was to be resumed.

83.     The following week, without notice, Defendant Mussman asked Ms. Herman to attend a meeting in which Defendants Williamson and Whinery were present.

84.     The Defendants inquired about her alleged failure to immediately report these cold-case files from the SART program.

85.     Ms. Herman explained that Defendants had forced upon her an unmanageable court docket (of which Defendant Mussman was fully aware because it was his assignment for her) and that she simply could not respond immediately and at the same time also diligently perform her assigned duties. She also stated that she had not worked in the intake unit for more than a year and did not think that she had any uncharged cases, and in no event would have viewed the SART files as consisting of such.

86.     Ms. Herman left the meeting confident that she had demonstrated that she had not engaged in any malfeasance regarding the files at issue.

**G.     The new administration conducted pre-disciplinary hearings without notice and wrongfully terminated Ms. Hoffman and Ms. Herman in violation of their protected civil rights.**

**1.     Defendants wrongfully terminated Ms. Hoffman.**

87.     On February 7, 2017 at approximately 10:15 am, Ms. Hoffman received a telephone call

14

from Rose Gheen in the human resources department asking Ms. Hoffman if she was planning to attend a pre-disciplinary conference at the Prosecutor's office in Cleveland at 1:30 pm that day.

88.     Prior to this telephone call, Ms. Hoffman had been given no notice of any pre-disciplinary conference.

89.     Thereafter, Ms. Gheen sent Ms. Hoffman an email with an attachment, regarding the employment allegations against her, and stated that Ms. Hoffman's attendance at the conference was mandatory.

90.     The email attachment alleged "Neglect of Duty" and cited the four cases that she had previously discussed with Defendants Mussman, Williamson, and Whinery on February 1, 2017.

91.     Ms. Hoffman attended the conference with Defendants Mussman and Williamson, and Mr. Sobczyk, along with the chief attorneys for the criminal division of the Prosecutor's office, Diane Russell and Russell Tye.

92.     When Ms. Hoffman stated that she had not had time to prepare a statement, given the short notice that she had received about the conference, Defendant Williamson told her that she would be given an opportunity to submit documentation after the meeting.

93.     Most of the conversation during the conference related to why Ms. Hoffman had delayed charging one case in particular which Ms. Hoffman explained that the particular case in question involved a child victim, and that Ms. Hoffman needed to meet with the victim on multiple occasions in order to build trust in order to gain the necessary information about the case.

94.     Ms. Hoffman stressed that she had always done what was asked of her by the Cuyahoga County Prosecutor's office, and had always received satisfactory, if not excellent, performance reviews.

95.     The committee appeared to dismiss Ms. Hoffman's explanations, and Ms. Hoffman left the pre-disciplinary conference in tears.

96.     The following day, February 8, 2017, before Ms. Hoffman was permitted to provide the pre-disciplinary committee with any documentation in response to the committee's accusations, Defendant Williamson informed Ms. Hoffman that she was found to be in violation of the Cuyahoga County Prosecutor's office's policy for Neglect of Duty, and Defendant Williamson stated that Ms. Hoffman must resign or be terminated.

97.     Ms. Hoffman was left with no choice but to resign, fearing that termination would have greater adverse consequences on her career.

98.     Thereafter, after its review and investigation into Ms. Hoffman's application for unemployment benefits, the Ohio Department of Job and Family Services Office of Unemployment Compensation awarded unemployment benefits to Ms. Hoffman and determined that: "The [Cuyahoga County Prosecutor's office] discharged the claimant for failure to perform job duties. However, it has not been established that the claimant failed to perform his/her duties as assigned. Ohio's legal standard that determines if a discharge is without just cause is whether the claimant's acts, omissions, or course of conduct were such that an ordinary person would find the discharge not justifiable. After a review of the facts, this agency finds that the claimant was discharged without just cause."

### 2.     Defendants wrongly terminated Ms. Herman.

99.     On February 7, 2017, feeling unwell and exhausted from her unworkable, newly-assigned court schedule, Ms. Herman requested sick leave from her supervisor, Lorain Debose.

100.    At around 10:30 am on the same day, Ms. Herman received an email from Rose Gheen, informing her that a mandatory pre-disciplinary conference was scheduled for 11:00 am.

101.    With the help of her husband to drive her, Ms. Herman arrived at her office where Ms. Debose confirmed that Defendant Mussman was aware that Ms. Herman had requested sick leave for that day.

16

102.     Nonetheless, Ms. Herman attended the conference with Defendants Mussman and Williamson, Mr. Sobczyk. Ms. Russel, and Mr. Tye.

103.     The committee asked Ms. Herman why it had taken her three days, after Defendant Mussman's January 24th meeting, to report the four case-files reviewed under the aspirational SART program.

104.     Ms. Herman explained, again, that her abnormally heavy court docket prevented her from responding any sooner than she did and also that she genuinely believed that she did not have any uncharged cases because she had not worked in the intake unit for over a year.

105.     When the committee asked about the SART program, Ms. Herman explained that she had been interested in SART because she was also a survivor of sexual assault and that as an older, more mature woman she felt that she possessed the appropriate temperament to handle sexual assault cases. In response, Defendant Mussman rolled his eyes.

106.     When the meeting ended, Ms. Herman asked if she could submit documents to support her recollection of events in response to the committee's accusations, and Defendant Williamson stated that she would be able to submit documents to the committee after the conference.

107.     The next day, February 8, 2017, Defendant Williamson called Ms. Herman and said that the Prosecutor's office had found grounds for terminating her, and that she would be terminated if she did not resign. Defendant Williamson did not tell Ms. Herman the basis of those alleged grounds for termination.

108.     Like Ms. Hoffman, Ms. Herman chose to resign rather than be terminated.

109.     Thereafter, after its review and investigation into Ms. Herman's application for unemployment benefits, the Ohio Department of Job and Family Services Office of Unemployment Compensation awarded unemployment benefits to Ms. Herman and determined that: "The [Cuyahoga County Prosecutor's office] discharged the claimant for failure to perform job duties.

However, it has not been established that the claimant failed to perform his/her duties as assigned. Ohio's legal standard that determines if a discharge is without just cause is whether the claimant's acts, omissions, or course of conduct were such that an ordinary person would find the discharge not justifiable. After a review of the facts, this agency finds that the claimant was discharged without just cause."

110. Ms. Hoffman, Ms. Herman, and their former supervisor Robin Belcher, were the only Assistant Prosecuting Attorneys to be forced to resign or be terminated by the Cuyahoga County Prosecutor's office in connection with the allegedly mishandled cases. The unit supervisor Ralph Kolasinsky, was permitted to retain his employment with the Prosecutor's office, and other Assistant Prosecutors with similar experience levels as Ms. Herman and Ms. Hoffman who were just as involved in the alleged misconduct, but were younger and not disabled, were either not disciplined in any way or allowed to keep their jobs at the office.

**H.    The Defendants defamed Ms. Hoffman and Ms. Herman in the press.**

111. The Defendants further injured Ms. Hoffman and Ms. Herman by defaming them to the general public.

112. In order to score political points and make it appear as though the Prosecutor's office was "cleaning house," Defendant O'Malley and other Defendants voluntarily spoke to numerous reporters about the uncharged sexual assault cases and Plaintiffs.

113. In an article published on *Cleveland.com* and in *The Plain Dealer*, which was further publicized in part by local television news stations including Fox 8 Cleveland and News Channel 5 Cleveland, Defendants O'Malley, Whinery, Driscoll, and Mussman stated that Ms. Hoffman and Ms. Herman were forced to resign for mishandling "the bulk of" 76 uncharged sexual assault cases, including 37 cases of rape and 32 cases of gross sexual imposition.

114. Defendants Whinery, Driscoll, and Mussman also stated that the cases had never fully been

reviewed and that over 1,900 cases had improperly been switched to inactive status.

115.     Defendant O'Malley cited "incompetency, inefficiency, and neglect of duty" as the reasons why Ms. Hoffman and Ms. Herman were forced to resign.

116.     In a television interview that aired on News Channel 5 Cleveland, Defendant O'Malley stated that the alleged mishandling of cases "wasn't an accident," implicating purposeful and potentially criminal misconduct and dereliction of duty by Ms. Hoffman and Ms. Herman.

117.     Defendant O'Malley also stated during a television interview that aired on Fox 8 Cleveland that the alleged mishandling of cases was a "complete failure of [Plaintiffs'] obligations."

118.     With regard to the cases allegedly improperly designated as "inactive," as reported and published by WCPN Ideastream, Defendant O'Malley accused Plaintiffs, among others, of misconduct by placing cases "on such a thing as an inactive list, where it ends up that employees just do nothing with the case" and described such designation as "never an acceptable resolution" despite the fact that Plaintiffs, as low-level employees, were following supervisors' instructions to do so.

119.     Further disparaging Ms. Hoffman's and Ms. Herman's reputations in an interview published by *The Morning Journal*, Defendant O'Malley (wrongly) stated that Plaintiffs acted unethically as Assistant Prosecutors by publicly threatening his intent to "refer prosecutors' names to the Ohio Supreme Court's disciplinary counsel" in connection with the allegedly mishandled files.

120.     Ms. Hoffman and Ms. Herman combined, however, were only ever assigned to work on six of the allegedly mishandled matters.

121.     The Prosecutor's office has since conceded in its submissions to the EEOC that Ms. Herman was terminated over the handling of four cases, and Ms. Hoffman over the handling of two cases—nothing close to "the bulk of" 76 cases.

122.     Ms. Hoffman and Ms. Herman did not mishandle or neglect any of the sexual assault cases

19

on which they were assigned to work.

123.    Ms. Hoffman and Ms. Herman had been rotated out of the intake unit, where cases are considered for criminal charges, for more than a year.

124.    Ms. Hoffman and Ms. Herman were relatively inexperienced Assistant Prosecuting Attorneys.

125.    Ms. Hoffman and Ms. Herman designated cases as inactive when and in the manner in which they were instructed to do so by supervising attorneys.

126.    The former chief of the juvenile justice unit, Duane Deskins, has denied that any such cases were mishandled, maintaining that his unit "did an aggressive job" of handling its case load. The Defendants have never put forth any evidence showing that their alleged scandal reveals anything more than reasonable differences between administrations regarding how to classify cases and allocate limited resources.

127.    Ms. Hoffman and Ms. Herman were competent, efficient, and diligent in their duties.

128.    Ms. Hoffman and Ms. Herman were committed to working with child victims and had only ever received satisfactory, if not excellent, performance evaluations while working for the Prosecutor's office.

129.    Ms. Herman, was passionate about working sexual assault cases, volunteered for the SART program, and worked 30 hours of overtime and unexpectedly managed five trials in the week after her transfer—hardly the actions of someone that could be described as neglectful of her duty.

**I.    Ms. Hoffman and Ms. Herman are damaged by Defendants' false and defamatory statements.**

130.    As noted above, Ms. Hoffman and Ms. Herman are attorneys whose reputations—specifically as it relates to competency and diligence—are important assets.

131.    Both Ms. Hoffman and Ms. Herman have worked diligently in the County to gain positive recognition and attempt to help others in connection with their duties.

132. The statements by the Defendants in the *Cleveland.com*, *The Plain Dealer*, WPCN Ideastream, and *The Morning Journal* articles, as well as in television interviews aired on Fox 8 Cleveland and News Channel 5 Cleveland, demonstrate an intentional or reckless disregard for the truth, calculated to smear Ms. Hoffman's and Ms. Herman's reputations in an effort to paint the new administration in a more favorable light than its predecessor.

133. Defendants' false and defamatory statements have reflected upon Ms. Hoffman's and Ms. Herman's characters by bringing them into ridicule, hatred, or contempt, have affected them injuriously in their trade or profession, and constitute defamation per se.

134. Defendants' false and defamatory statements serve, as the Prosecutor's office intended, to present Ms. Hoffman and Ms. Herman in a false light, as public servants who are incompetent, inefficient, unethical, and neglectful of their duties.

135. The Prosecutor's office's false and defamatory statements are harmful to the reputations of Ms. Hoffman and Ms. Herman, who have committed themselves to public service.

136. Defendants' false and defamatory statements will make it harder for Ms. Hoffman and Ms. Herman to obtain and hold employment in comparable positions within the legal profession.

137. Such false and defamatory statements would be highly offensive to any reasonable individual.

138. The false and defamatory statements have directly and proximately caused Ms. Hoffman and Ms. Herman to suffer mental distress that naturally results from a false and defamatory smear of such magnitude.

## V. Claims

### Count one: Disability discrimination against Laura Hoffman in violation of the Americans with Disabilities Act of 1990, 42 U.S.C.S. § 12101 et. seq.

139. Plaintiff Hoffman realleges all the above paragraphs as though fully rewritten herein.

140. This count one is asserted against Defendants O'Malley and Mussman, only, in their

21

personal and official capacities.

141.    Defendants O'Malley and Mussman terminated Ms. Hoffman's employment in substantial part, due to her physical disability and Defendants' unwillingness to provide reasonable accommodation for her disability.

142.    As a proximate result of Defendants' discrimination against Ms. Hoffman on the basis of her disability, she has suffered and continues to suffer substantial losses, including the loss of past and future earnings and other employment benefits.

143.    As further proximate result of Defendants' actions, Ms. Hoffman has suffered and continues to suffer severe and lasting emotional distress and other consequential damages and expenses.

144.    The conduct of Defendants was in violation of the ADA, was malicious, intended to injure Ms. Hoffman, and was done with reckless indifference to Ms. Hoffman's protected civil rights, entitling her to an award of compensatory damages, punitive damages, and attorneys' fees.

### Count two: Age discrimination against Linda Herman in violation of the Age Discrimination in Employment Act, 29 U.S.C.A. § 621, et. seq.

145.    Plaintiff Herman realleges all the above paragraphs as though fully rewritten herein.

146.    This count two is asserted against Defendants O'Malley and Mussman, only, in their personal and official capacities.

147.    Defendants O'Malley and Mussman terminated Ms. Herman's employment, in substantial part, due to her age, which is significantly older than that of her peers who were not terminated.

148.    As a proximate result of Defendants' discrimination against Ms. Herman on the basis of her age, she has suffered and continues to suffer substantial losses, including the loss of past and future earnings and other employment benefits.

149.    As further proximate result of Defendants' actions, Ms. Herman has suffered and continues to suffer severe and lasting emotional distress and other consequential damages and expenses.

150.    The conduct of Defendants was in violation of the ADEA, was malicious, intended to injure

Ms. Hoffman, and was done with reckless indifference to Ms. Hoffman's protected civil rights, entitling her to an award of compensatory damages, punitive damages, and attorneys' fees.

### Count three: Disability discrimination against Laura Hoffman in violation of Ohio Revised Code § 4112.02(A)

151.    Plaintiff Hoffman realleges all the above paragraphs as though fully rewritten herein.

152.    This count three is asserted against Defendants O'Malley and Mussman, only, in their personal and official capacities.

153.    Defendants O'Malley and Mussman terminated Ms. Hoffman's employment, in substantial part, due to her physical disability and Defendants' unwillingness to provide reasonable accommodation for her disability including but not limited to under the terms, conditions, and/or privileges of employment.

154.    As a proximate result of Defendants' discrimination against Ms. Hoffman on the basis of her disability, she has suffered and continues to suffer substantial losses, including the loss of past and future earnings and other employment benefits.

155.    As further proximate result of Defendants' actions, Ms. Hoffman has suffered and continues to suffer severe and lasting emotional distress and other consequential damages and expenses.

156.    The conduct of Defendants was outrageous and malicious and was intended to injure Ms. Hoffman, and was done with reckless indifference to Ms. Hoffman's protected civil rights, entitling her to an award of punitive damages.

157.    The conduct of Defendants was in violation of R.C. 4112.02(A), was malicious, intended to injure Ms. Hoffman, and was done with reckless indifference to Ms. Hoffman's protected civil rights, entitling her to an award of compensatory damages, punitive damages, and attorneys' fees.

### Count four: Age discrimination against Linda Herman in violation of Ohio Revised Code § 4112.14

158.    Plaintiff Herman realleges all the above paragraphs as though fully rewritten herein.

159.    This count four is asserted against Defendants O'Malley and Mussman, only, in their personal and official capacities.

160.    Ms. Herman's employment was terminated, in substantial part, due to her age (which is significantly older than that of peer attorneys) including but not limited to the unexpected, unworkable expectations and assignments not shared by her younger peers under the terms, conditions, and/or privileges of employment.

161.    As a proximate result of Defendants' discrimination against Ms. Herman on the basis of her age, she has suffered and continues to suffer substantial losses, including the loss of past and future earnings and other employment benefits.

162.    As further proximate result of Defendants' actions, Ms. Herman has suffered and continues to suffer severe and lasting emotional distress and other consequential damages and expenses.

163.    The conduct of Defendants was in violation of R.C. 4112.14, was malicious, intended to injure Ms. Hoffman, and was done with reckless indifference to Ms. Hoffman's protected civil rights, entitling her to an award of compensatory damages, punitive damages, and attorneys' fees.

## Count five: Defamation per se

164.    Plaintiffs reallege all the above paragraphs as though fully rewritten herein.

165.    This count five is asserted against all Defendants in both their personal and official capacities.

166.    Defendants widely published, through *Cleveland.com*, *The Plain Dealer*, WCPN Ideastream, *The Morning Journal*, and television news reports that aired on Fox 8 Cleveland and News Channel 5 Cleveland, false and defamatory statements regarding the Plaintiffs, including but not limited to claims that the Plaintiffs were responsible for mishandling the bulk of 76 uncharged sexual assault cases, that they intentionally let these cases lie dormant, that they "completely failed" to perform their duties, acted unethically, and were terminated for these reasons.

167.   These are statements of fact that were demonstrably false at the time they were made.

168.   Defendants knew the statements were false, or acted in reckless disregard for the truth, at the time they published the statements.

169.   Defendants made these statements in the course and scope of Defendants' employment with the Prosecutor's office.

170.   These false statements recklessly, intentionally, and falsely imply that Plaintiffs engaged in potentially criminal activity.

171.   These statements were intended to and have reflected upon Plaintiffs' character by bringing them into ridicule, hatred, or contempt, and were intended to and have affected them injuriously in their trade or profession. Thus, these statements constitute defamation per se.

172.   As a result of Defendants' publication of these false and defamatory statements, Plaintiffs have suffered mental distress and damage to their personal and professional reputations.

### Count six: False light (invasion of privacy)
### (against all Defendants in their personal and official capacities)

173.   Plaintiffs reallege all the above paragraphs as though fully rewritten herein.

174.   This count six is asserted against all Defendants in both their personal and official capacities.

175.   Ohio recognized a tort for false light invasion of privacy in *Welling v. Weinfeld*, 113 Ohio St. 3d 464, 2007-Ohio-2451, 866 N.E.2d 1051, ¶ 1.

176.   Defendants widely published, through *Cleveland.com*, *The Plain Dealer*, WCPN Ideastream, *The Morning Journal*, and television news reports that aired on Fox 8 Cleveland and News Channel 5 Cleveland, false statements regarding the Plaintiffs, including but not limited to claims that Plaintiffs were responsible for mishandling the bulk of 76 uncharged sexual assault cases, that they intentionally let these cases lie dormant, that they "completely failed" to perform their duties, acted unethically, and were terminated for these reasons..

177.   These are statements of fact that were demonstrably false at the time they were made.

178.    Defendants knew the statements were false, or acted in reckless disregard for the truth, at the time they published the statements.

179.    Defendants made these statements in the course and scope of Defendants' employment with the Prosecutor's office.

180.    Defendants knew that these statements would damage Plaintiffs by painting them in a false and negative light in the manner described above, and chose to publish the statements.

181.    As a result of Defendants' publication of these false and defamatory statements, Plaintiffs have suffered mental distress and damage to their personal and professional reputations.

WHEREFORE, Plaintiffs demand judgment against the Defendants, jointly, in an amount in excess of seventy-five thousand dollars ($75,000.00), together with punitive and exemplary damages, attorneys' fees, costs, expenses and any other relief to which the Plaintiffs may each be entitled or that the Court finds is appropriate or equitable.

## VI. Jury demand

Plaintiffs demand a trial by jury on all issues within this Complaint.

Respectfully submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
Dean Williams (0079785)
THE PATTAKOS LAW FIRM LLC
101 Ghent Road
Fairlawn, OH 44333
330.836.8533 Phone
330.836.8536 Fax
peter@pattakoslaw.com
dwilliams@pattakoslaw.com