1          IN THE UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF OHIO - EASTERN DIVISION

3

LAURA HOFFMAN, et al.,

4              Plaintiff,

5                                  JUDGE BOYKO
     -vs-                          CASE NO. 1:18-CV-00309

6

MICHAEL O'MALLEY, et al.,

7              Defendants.

8                         -   -   -   -

9

10      Videotaped deposition of RYAN MIDAY, taken as

11   if upon examination before Chana Margareten, a

12   Notary Public within and for the State of Ohio,

13   at the Cuyahoga County Prosecutor's Office, 1200

14   Ontario Street, Eighth Floor, Cleveland, Ohio, at

15   11:28 a.m. on Friday, June 14, 2019, pursuant to

16   notice and/or stipulations of counsel, on behalf

17   of the Plaintiffs in this cause.

18                      -   -   -   -

19                  JK REPORTING
                   55 PUBLIC SQUARE
20                    SUITE 1332
                 CLEVELAND, OHIO 44113
21                  (216)664-0541

22                  WWW.JARKUB.COM

23

24

25

1  APPEARANCES:

2      Peter Pattakos, Esq.
       Rachel Hazelet, Esq.
3      The Pattakos Law Firm, LLC
       101 Ghent Road
4      Fairlawn, Ohio  44333
       (330) 836-8533,
5
           On behalf of the Plaintiffs;
6
       David G. Lambert, Esq.
7      Nora Poore, Esq.
       Cuyahoga County Prosector's Office
8      1200 Ontario Street, Eighth Floor
       Cleveland, Ohio  44113
9      (216) 443-7829,

10         On behalf of the Defendants.

11  ALSO PRESENT:

12     Joanna Whinery
       Jennifer Driscoll
13     Gregory Mussman
       Michael C. O'Malley

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2         EXAMINATION
          RYAN MIDAY
3         BY MR. PATTAKOS:                          5

4

                        EXHIBIT INDEX
5

          Plaintiff's Exhibit 1                    12
6         Plaintiff's Exhibit 2                    24
          Plaintiff's Exhibit 3                    40
7         Plaintiff's Exhibit 4                    47
          Plaintiff's Exhibit 5                    53
8         Plaintiff's Exhibit 6                    56
          Plaintiff's Exhibit 7                    61
9         Plaintiff's Exhibit 8                    62

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1                    THE VIDEOGRAPHER:  We're on the
 2           record.  The time is 11:28.  Today is
 3           Friday, June 14, 2019.  We are at the
 4           Cuyahoga County Prosecutor's Office located
 5           in Cleveland, Ohio, to take the deposition
 6           of Ryan Miday on behalf of the plaintiff,
 7           in the case titled Laura Hoffman, et al
 8           versus Michael O'Malley, et al. Case Number
 9           1:18-CV-00309, in the United States
10           District Court, Northern District of Ohio,
11           Eastern Division.
12                    My name is Peter Graves from JK
13           Reporting.  The court reporter today is
14           Chana Margareten from JK Reporting.
15                    Will counsel please -- present
16           please identify themselves for the record.
17                    MR. PATTAKOS:  Peter Pattakos for
18           the plaintiffs.
19                    MS. HAZELET:  Rachel Hazelet for
20           the plaintiffs.
21                    MR. LAMBERT:  Dave Lambert,
22           assistant county prosecutor, for the
23           defendants.
24                    THE VIDEOGRAPHER:  Will the court
25           reporter --
```

```
 1                    MS. POORE:  Nora Poore -- sorry,

 2              Nora Poore, assistant prosecuting attorney,

 3              also for defendants.

 4                    THE VIDEOGRAPHER:  Will the court

 5              reporter please swear in the witness.

 6          RYAN MIDAY, of lawful age, called by the

 7      Plaintiffs for the purpose of examination, as

 8      provided by the Rules of Civil Procedure, being

 9      by me first duly sworn, as hereinafter certified,

10      deposed and said as follows:

11                   EXAMINATION OF RYAN MIDAY

12      BY MR. PATTAKOS:

13  Q.  Good morning, sir.  My name is Peter Pattakos and

14      I represent the plaintiffs in this lawsuit.

15          Will you please state your name for the

16      record.

17  A.  Ryan Miday.

18  Q.  What's your birthday?

19  A.  9/26███.

20  Q.  What's your address?

21  A.  ██████████████████████████████████.

22  Q.  What's your current position at the prosecutor's

23      office?

24  A.  Director of communications policy.

25  Q.  How long have you been in that position?
```

```
 1    A.   It was January 3, 2017.

 2    Q.   So you came in with the O'Malley Administration?

 3    A.   Yeah.

 4    Q.   Did you know Mr. O'Malley before January 2017?

 5    A.   Yeah.

 6    Q.   How did you know him?

 7    A.   I worked with him here in the prosecutor's

 8         office.

 9    Q.   When?

10    A.   Oh, boy.  2000 -- I don't know 2007ish, '08,

11         maybe.

12    Q.   Until?

13    A.   Until I left, which was, I don't know, maybe like

14         2011.

15    Q.   And which administration was that?

16    A.   Bill Mason.

17    Q.   In the prosecutor's office?

18    A.   Uh-huh.

19    Q.   Same office?

20    A.   Yeah.

21    Q.   Different prosecutor, correct?

22    A.   Same office.

23    Q.   Okay.  I should have asked, are you feeling well

24         enough to testify today?

25    A.   Yeah, I am.
```

```
 1   Q.  Is there -- have you ingested any substances that
 2       would impair your ability to recall events
 3       accurately or testify truthfully?
 4   A.  No.
 5   Q.  Is there any other reason that you would not be
 6       able to recall events accurately or testify
 7       truthfully today?
 8   A.  No.
 9   Q.  Were you the director of communications under the
10       Mason Administration, as well?
11   A.  I had a different title.
12   Q.  What was your title?
13   A.  Public information officer.
14   Q.  Essentially, the same position?
15   A.  Essentially, the same thing.
16   Q.  What are your qualifications for this position?
17   A.  I did similar work in New York City.  And then,
18       of course, working with Prosecutor O -- Mason.
19       And I've handled -- press secretary for another
20       candidate in New York City.
21   Q.  Who did you work for in New York?
22   A.  Giovanni Puello, was a candidate.  And then I
23       worked for a state assemblyman, Jeffrey Dinovitz.
24                   MR. LAMBERT:  Did you get those
25           names?
```

```
 1                    THE REPORTER:  Yes.

 2   Q.  What was the first name?

 3   A.  Giovanni Puello.

 4   Q.  How do you spell that?

 5   A.  P-u-e-l-l-o, Puello, Giovanni.

 6   Q.  What was he a candidate for?

 7   A.  New York City Council.

 8   Q.  What year?

 9   A.  I don't know.  I don't recall.

10   Q.  Around what time?

11   A.  Early 2000s, I think.

12   Q.  And what year did you work for Mr. Dinovitz?

13   A.  See, I left 2006.  Probably 2000s till about

14       2006, I believe.

15   Q.  Was that in New York City or Albany or --

16   A.  New York City.

17   Q.  We were in New York City at the same time.

18   A.  Really?

19   Q.  I was there from '96 to 2004.

20   A.  Doing what?

21   Q.  Went to undergrad at NYU, and then I worked for

22       the mayor's office.  I worked for OMB --

23   A.  Really?

24   Q.  -- under Giuliani and Bloomberg.

25   A.  Wow.
```

```
 1   Q.  Yeah.

 2   A.  That's interesting.

 3   Q.  I was an analyst.  I was -- I would review the

 4       capital projects to make sure they were eligible

 5       for the bond financing.

 6   A.  Yeah.

 7   Q.  It was a good law school job.

 8   A.  Yeah, that's great.

 9   Q.  I was there for 911 and the blackout and

10       everything.

11   A.  Yes, I was there, too.  It was something else.

12       Yeah.

13   Q.  We could chat about that on the break.  It was a

14       good time to be in the City.

15   A.  Yeah, it was, especially when Giuliani came in.

16   Q.  It's changed a lot.

17   A.  Yeah, it was considered ungovernable.

18   Q.  Well, I will look forward to chatting about that

19       on the break.

20           So what are your responsibilities as director

21       of communications?

22   A.  Just generally -- generally communicating

23       information about the office to the public, as

24       well as information from the public to -- you

25       know, internally to, you know, prosecutors and
```

```
 1              staff.

 2     Q.   So you're sort of like the Sarah Huckabee Sanders

 3          of this office; is that fair?

 4     A.   No, that's not fair.

 5     Q.   Why?

 6     A.   Well, let's choose some -- choose another name,

 7          other than Sarah.

 8     Q.   But the position is essentially the same, right?

 9     A.   Yes.

10     Q.   You're the public spokesman for this office?

11     A.   Yes.

12     Q.   Got you.  Okay.

13     A.   She left, didn't she?

14     Q.   Is she gone now?

15     A.   Yeah, I think she is going to run for governor,

16          so maybe I should say "yes".

17     Q.   Oh, boy.

18     A.   That would be my next -- my next venture, right?

19     Q.   Okay.  How did you end up with the job with

20          Mr. Mason in the first place?

21     A.   I applied.

22     Q.   Why did you apply?

23     A.   Because I have done similar experience in New

24          York City.

25     Q.   And why did you come to Ohio?
```

1  A.  I'm from Ohio.

2  Q.  Okay.  Did you go to high school around here?

3  A.  No.

4  Q.  Where are you from?

5  A.  Madison.

6  Q.  And you -- were you applying for jobs all over

7      the place or you wanted specifically to move

8      home?

9  A.  No, I wanted to move home.  I have been there

10     ten years, it was time to move; subway, bus,

11     subway, bus, bus, subway.

12  Q.  I understand.

13  A.  After a while, it got -- it was great, but it was

14     time to move back.

15  Q.  No place like Ohio.

16      Have you ever had your deposition taken

17     before?

18  A.  No.

19  Q.  Have you ever been in a deposition before?

20  A.  I don't recall.  I don't believe so.

21  Q.  You understand how it works, generally, that I

22     ask questions, you answer them, unless Dave

23     specifically instructs you not to?

24  A.  Yes.

25  Q.  And you understand that Dave may object to

```
 1        certain questions, but that those are generally
 2        just to form, and that you are to answer the
 3        question even when he objects, again, unless he
 4        specifically instructs you not to?
 5                    THE WITNESS:  Do you understand
 6             it, Dave?
 7                    MR. LAMBERT:  That's accurate.
 8   A.   Okay.
 9   Q.   Okay.  And if you don't understand the question,
10        please ask me.
11   A.   Okay.
12   Q.   Okay.  And I will try to rephrase it.
13             Okay.  You understand you have been
14        specifically designated to testify today by the
15        office?
16   A.   Yes.
17                         -  -  -  -
18             (Thereupon, Plaintiff's Exhibit 1 was marked
19             for purposes of identification.)
20                         -  -  -  -
21   Q.   I am going to hand you what's been marked as
22        Exhibit 1, and ask if you could identify this
23        document for the record.
24   A.   What's your question?
25   Q.   Do you recognize this document?
```

1    A.   Yes, I believe this is what the Plain Dealer sent

2         me when they asked for a comment.

3    Q.   Okay.

4                    MR. POORE:  Did you look at the

5              document?

6                    THE WITNESS:  What's that --

7                    MR. POORE:  Did you look at --

8    A.   This is the lawsuit.

9    Q.   No, sir.  This is a notice of video deposition --

10   A.   Okay.

11   Q.   -- that we issued to the office.

12   A.   Okay.

13                   MR. LAMBERT:  Read it.  Don't skim

14             it, read it.

15   A.   Okay.  What's your question?

16   Q.   Does it refresh your memory to have looked at

17        this document?  Do you know what it is?

18   A.   Of this document?

19   Q.   Yes.

20   A.   Yeah, I'm familiar with it.  What specifically

21        are you asking about?

22   Q.   Well, what do you understand about this document?

23   A.   Well, there's five different points.  What's your

24        question?

25   Q.   Do you understand that you've been designated to

1    testify on the County's behalf pursuant to this

2    document?

3  A.  Yeah, I answered your question before, that I was

4    designated to testify.

5  Q.  And that is to subject number five, correct --

6    I'm sorry, number four, correct?

7  A.  Yeah, the communications with members of the

8    media, yes.

9  Q.  Yes.  That you have been designated by the

10   County, by the prosecutor's office, to testify on

11   the office's behalf about communications with

12   members of the news media about the alleged

13   mishandling of sexual assault cases in the

14   juvenile justice unit in 2017, which led to the

15   allegedly defamatory news coverage, as identified

16   in the complaint in this lawsuit, and the reasons

17   why the County communicated with the media about

18   this subject.

19      Am I reading that correctly?

20  A.  Yeah, you are reading it, but I disagree with,

21   which lead to defamatory news coverage.

22  Q.  What is it that you disagree with?

23  A.  I just disagree with the characterization of it.

24  Q.  Well, we're saying, it's allegedly defamatory.

25  A.  Okay.  Well, I disagree with it.

1  Q.  You disagree that it's defamatory?

2  A.  I just disagree with how it's characterized.

3  Q.  In what way?

4  A.  You're asking me -- you asked me if I agreed with

5      that statement, and I answered you.

6  Q.  Sir, I'm asking you if you understand that you

7      are here to testify about this subject identified

8      in top number one?

9  A.  And I answered that before.  The answer is "yes".

10                    MR. LAMBERT:  We'll stipulate that

11             he is, if that helps.

12                    MR. PATTAKOS:  I also want to know

13             what his understanding is of why he's here

14             and what he's testifying about, so --

15                    THE WITNESS:  I've answered that

16             three times.

17  Q.  Okay.  Do you believe you're qualified to testify

18      to this subject matter?

19  A.  Yes.

20  Q.  And what are your qualifications to testify to

21      this subject matter?  Why are you qualified?

22  A.  Didn't you already ask me that?

23  Q.  No.

24  A.  Yeah, you did.  We went through my resume.  I

25      mean, I'm not sure what else you want me to say.

1   Q.  Well, you had personal involvement in these

2        communications, didn't you, sir?

3   A.  Yes.

4   Q.  Okay.  Do you believe anyone at this office knows

5        more about the County's communications with the

6        news media about this issue and the reasons why

7        the County communicated with the media about this

8        issue than you do?

9   A.  No. I think -- I think that's a fair statement.

10   Q.  Did you make the decision to communicate with the

11       news media about this case?

12   A.  I made a recommendation.

13   Q.  To whom?

14   A.  To Mr. O'Malley.

15   Q.  It was ultimately his decision, though, correct?

16   A.  Yes.

17   Q.  Was it your idea to first go to the media with

18       this?

19   A.  It was my recommendation that we do.

20   Q.  I understand that it was your recommendation.

21       What I'm -- I'm asking a different question.  I'm

22       asking, who first came up with the idea that you

23       might communicate with the media about this?

24   A.  I don't recall, but I know I made a

25       recommendation to Prosecutor O'Malley.

1  Q.  Were you the first one that suggested that the

2      office communicate with the media about this?

3  A.  Well, the media was calling -- the media had been

4      calling the office.

5  Q.  About what?

6  A.  About sex -- sex cases.

7  Q.  About the rape at Cleveland Heights, correct?

8  A.  That was one case, yes.

9  Q.  And that was what got the ball rolling on all

10     this, correct?

11 A.  Yes, that was the main case.

12 Q.  What else do you remember about this?

13 A.  About what?

14 Q.  About how the County came to be communicating

15     with the media about allegedly mishandled sexual

16     assault cases?

17 A.  Again, I'll restate, we had started getting calls

18     from the media about a particular case out of

19     Cleveland Heights.  And then that sort of led

20     into uncovering these cases that weren't handled

21     properly.

22 Q.  Did you have any role in uncovering the cases?

23 A.  No.

24 Q.  Who is Kathleen Caffrey?

25 A.  She worked for me at the time.

1    Q.  At what time?

2    A.  The beginning of -- I guess we're talking about

3        in January of 2017.

4    Q.  Uh-huh.  What was her position?

5    A.  I think her title was public information officer.

6    Q.  She reported to you?

7    A.  Yeah.

8    Q.  She no longer works for you?

9    A.  She works in a different part of the office now.

10   Q.  What part of the office?

11   A.  In ICAC; ICAC, Internet Crimes Against Children

12       Task Force.

13   Q.  When did she stop working for you?

14   A.  I don't recall.  Maybe -- I don't recall.  Maybe

15       last year.

16   Q.  What were her responsibilities when she worked

17       for you?

18   A.  Similar responsibilities.  I mean, we shared

19       responsibilities in the sense of communicating

20       with the media and communicating back to the --

21       internally, into the office.

22   Q.  And that was her responsibilities between January

23       and March of 2017?

24   A.  Yeah.  Yes.

25   Q.  Once the office had determined that a number of

```
1          sexual cases had been allegedly mishandled, how
2          did this come to be reported in the newspaper?
3     A.   I contacted -- well, again, the media had started
4          to call about these cases, right?
5     Q.   Uh-huh.
6     A.   So they were calling, and then like I said, I
7          made a recommendation that we engage Rachel
8          Dissell.
9     Q.   And why did you make that recommendation?
10    A.   For a number of reasons.  Again, media had
11         already been starting to call.  And, you know,
12         eventually, this was going to get out into the
13         media.  So it's -- I think it was important to
14         proactively contact the reporter who was familiar
15         with juvie court in particular.
16    Q.   And Rachel was familiar with juvie court?
17    A.   Yeah, very familiar.
18    Q.   And why was she very familiar?
19    A.   Oh, she's reported on juvie court for years, as
20         you know.
21    Q.   She's a good reporter, right?  She's very
22         knowledgeable?
23    A.   Knowledgeable about what?
24    Q.   About how the court works.
25    A.   About what court?  Juvie court?
```

1   Q.   Yes.

2   A.   Yeah.

3   Q.   Okay.  And she's very conscientious about her

4        job, correct?

5   A.   What do you mean by that?

6   Q.   I mean exactly what I said.  Do you know what

7        "conscientious" means?

8   A.   I mean, define it for me.  I'm not going to

9        speculate on her state of mind with respect to

10       her job.

11  Q.   Well, don't you, as the communications director

12       for a large and important public office, form

13       opinions about whether certain reporters are good

14       at their jobs or not?

15  A.   That's why I contacted her.

16  Q.   Okay.  Conscientious is defined -- I will tell

17       you what, I will pull up the Merriam Webster

18       definition.  It's meticulous and careful.

19                  MR. LAMBERT:  Okay.  I'm going to

20            object on the ground that this is opinion.

21            Go ahead.

22  Q.   You believed Rachel is a meticulous and careful

23       reporter?

24  A.   She's a good reporter.

25  Q.   Okay.  Another definition that comes up is

1    wishing to do what is right, especially to do

2    one's work or duty well and thoroughly.

3         Do you believe that Rachel is one who wishes

4    to do what is right, especially to do her work or

5    duty well and thoroughly?

6                   MR. LAMBERT:  Objection.  Calls

7         for opinion.  Go ahead.

8                   MR. PATTAKOS:  Yeah, I am asking

9         for his opinion.

10   A.   I can't answer that.  I don't --

11   Q.   Okay.

12   A.   I think she's a good reporter.

13   Q.   And you invited Rachel to come to the

14   prosecutor's office for an interview, correct?

15   A.   Did I ask her to come to the office?  She ended

16   up not reporting on the story.

17   Q.   Right.

18   A.   Okay.

19   Q.   But she did come to the office, correct?

20   A.   On this story?

21   Q.   Yes.

22   A.   I don't recall.

23   Q.   Did you review any documents to prepare for

24   today?

25   A.   I did.

1   Q.   What documents did you review?

2   A.   What do you mean?  Be more specific.

3   Q.   I don't know that I can, sir.  I'm asking you

4        what documents did you review to prepare for

5        today?

6   A.   E-mails, correspondence; generally that, e-mail,

7        correspondence.

8   Q.   Which e-mails, which correspondence?

9   A.   Correspondence with the media.

10  Q.   That you had about this issue, correct?

11  A.   Yeah.

12  Q.   So you don't remember whether Rachel came to this

13       office about this matter?  Is that your

14       testimony?

15  A.   My testimony is I don't recall.  I don't believe

16       that she -- she didn't report on this story.  And

17       if she were here, I don't recall if she was here

18       specifically on this story.

19  Q.   You invited Rachel to come to the office for an

20       interview, correct?

21  A.   For the interview for what?

22  Q.   About this story.

23  A.   I don't recall exactly.  I believe she was here

24       at this office, but I don't believe that she was

25       here on this case, but I don't recall.

```
1    Q.   You don't recall having a meeting with Rachel,

2         Mr. O'Malley, Ms. Williamson, Mr. Mussman, and

3         Ms. Driscoll here at this office?

4    A.   On what?

5    Q.   On these -- on the allegedly mishandled --

6    A.   With Rachel Dissell?

7    Q.   -- sexual assault cases?  Yes.

8    A.   No, I don't recall that.

9    Q.   Okay.  You wanted Rachel to write about the case,

10        right?

11   A.   So I contacted her.

12   Q.   And she didn't write about the case, correct?

13   A.   That's what I said earlier.

14   Q.   And why didn't -- what is your understanding of

15        why Rachel didn't end up reporting on this story?

16   A.   I learned at the time that there was a -- it was

17        different -- there were different beats within, I

18        think it was cleveland.com and the Plain Dealer.

19             And the court reporter was Cory Shaffer, and

20        I believe they felt it was a court -- a court --

21        you know, reporting on a court case -- cases, so

22        he ended up reporting on it.

23   Q.   Rachel doesn't write for cleveland.com, does she?

24   A.   I don't believe so, but it's -- you know, it's

25        blurry.  I believe it was Plain Dealer.  Is it
```

```
 1        Advance Ohio?  But at the time she -- she was not

 2        writing for cleveland.com.  Or, at least I should

 3        say, Cory was writing for cleveland.com.

 4   Q.   Okay.  Sorry.  So you believe that Rachel wasn't

 5        going to follow the story, because it was Cory

 6        Shaffer's responsibility?

 7   A.   According to an -- what she e-mailed me

 8        indicating that.

 9   Q.   Okay.

10   A.   I think I also probably spoke with her on the

11        phone, but I don't recall a phone call, but I

12        know that in an e-mail it indicated that.

13   Q.   Okay.  Cory Shaffer writes in an e-mail that you

14        said to him that you didn't think that Rachel was

15        following the story anymore.

16   A.   Okay.

17   Q.   Did you say that to Mr. Shaffer?

18   A.   What are you referring to?

19                       -  -  -  -

20        (Thereupon, Plaintiff's Exhibit 2 was marked

21         for purposes of identification.)

22                       -  -  -  -

23   Q.   Well, here let's look at Exhibit 1 -- or

24        Exhibit 2.  It's an e-mail from Cory Shaffer to

25        Chris Warnousky.  Do you know who Chris is?
```

```
 1   A.   I think it was his editor.

 2   Q.   Yes.

 3   A.   Is that right?

 4   Q.   I think that's right.  It says in the third

 5        paragraph here, Ryan Miday says he didn't think

 6        Rachel was following the story anymore.

 7                    MR. LAMBERT:  Could you give him

 8             one second?  Take a minute and read that.

 9   A.   February 10th.  Okay.

10   Q.   Is that accurate, sir?  Did you tell Cory that

11        you didn't think Rachel was following the story

12        anymore?

13   A.   Yes.

14   Q.   And what made you think that?

15   A.   I stated earlier, I believe it was -- I received

16        an e-mail from Rachel indicating that she wasn't

17        covering the story.  Or, I think I probably also

18        spoke with her on the phone.

19   Q.   Okay.  So you were wanting Cory to have an

20        exclusive on this, right?

21   A.   What?

22   Q.   You wanted Cory to have an exclusive on this to

23        get -- to have this meeting with the office

24        first, before anybody else reported on the story,

25        correct?
```

1   A.  No, I don't -- an exclusive to Cory, we ended up

2       doing the story as well, with Cleveland -- or Fox

3       8.

4   Q.  Well, I understand that, but if Cory writes here

5       that Ryan also told me that a TV station has

6       started asking about the situation this morning.

7       He said if we wanted to do anything on it, he

8       would hold off on responding to them until

9       Monday.

10  A.  Okay.

11  Q.  Did you say that to Cory?

12  A.  Yes.

13  Q.  And why?

14  A.  Because there was another TV station inquiring.

15  Q.  Why would you hold off?

16  A.  Because another TV station was inquiring.

17  Q.  I'm trying to understand why it matters.

18  A.  Well, I don't understand what you don't

19      understand, as far as you got different media

20      outlets following a story.

21  Q.  Uh-huh.

22  A.  So --

23  Q.  Uh-huh.  Why would you hold off on talking to the

24      TV station?  What's the reason?

25  A.  I don't recall at the time.  Maybe it was a

1     scheduling conflict with the TV station or it was

2     trying to arrange schedules for Cleveland -- or

3     Fox 8 and cleveland.com.

4  Q.  But why would you tell Cory Shaffer that you

5     would hold off on responding to the TV station?

6  A.  I don't understand your question.  I just told

7     you why.

8  Q.  What would scheduling have to do with it?

9  A.  What do you mean, what would scheduling -- if

10    somebody's -- if you're calling me, if you're a

11    media outlet and you're calling me for an

12    interview, and I have got somebody else calling

13    as well, can we -- can we do it on Monday, Pete?

14    Scheduling -- scheduling may not work out on

15    Friday.  Or I think this was on a Friday, so

16    there's various reasons.

17  Q.  So you're telling me that this was not intended

18    to give Cory first access to the story?

19  A.  Well, we ended up -- we did it with Fox 8, as

20    well.  I don't under --

21  Q.  So you're denying that that was the intent?

22  A.  No, no, now you're putting -- what do you mean,

23    I'm denying?  I didn't say anything about

24    denying.  You're putting words in my mouth, Pete.

25  Q.  I'm trying to understand your testimony.

```
 1  A.  No, you're putting words in my mouth.  I state
 2      here that -- it says, Ryan Miday says he didn't
 3      think Rachel was following the story.  He also
 4      told me a TV station started asking about the
 5      sit -- about the situation this morning.  He said
 6      if he wanted to, we would hold off in responding
 7      until Monday.
 8  Q.  Is it true or is it not that your intent was to
 9      give Cory first access to the story?
10  A.  I know that was the intent when we contacted
11      Rachel.
12  Q.  That was the intent when you contacted Rachel?
13  A.  Yes.
14  Q.  But --
15  A.  But there are other -- there were other media at
16      the time contacting us about the Cleveland
17      Heights case.
18  Q.  I understand your testimony about the
19      communications with Rachel.  I want to understand
20      now the communications with Cory, okay?
21  A.  Okay.
22  Q.  Is it true or is it not that the intent when you
23      told Cory that you would hold off on responding
24      to the TV station was to give Cory first access
25      to the story?
```

1   A.  Well, if it was, I wouldn't have rescheduled -- I

2       wouldn't have -- we wouldn't have done it on

3       Monday with Fox 8.

4   Q.  So it was not?

5   A.  I didn't say it wasn't.

6   Q.  Was it or was it not?

7   A.  We did an interview with Fox 8 and cleveland.com

8       on Monday.

9   Q.  I understand that, sir.  I just don't think it's

10      responsive to my question.

11   A.  I think it is responsive.  I just told you we did

12      an interview with two -- with two media outlets.

13   Q.  I am going to try one more time.

14   A.  Okay.

15   Q.  When you told Cory that if Cory wanted to do

16      anything on this story that you would hold off on

17      responding to the TV station until Monday, did

18      you intend to give Cory first access to the story

19      or did you not?

20   A.  On Monday, we did an interview with Fox 8 and

21      cleveland.com.

22   Q.  So you just don't want to answer the question?

23   A.  No, that -- no, that's --

24             MR. LAMBERT:  Do you want to go

25         off the record and talk about this?

1           MR. PATTAKOS:  No, I don't.

2    Q.    Okay.  Let's go on.  What other reporters did the

3          office contact about this story?

4    A.    When?

5    Q.    At all.

6    A.    Did we contact or did they contact us?

7    Q.    Who did you reach out to? "You", meaning the

8          office.

9    A.    Channel 5 had been calling, Channel 8 had been

10         calling, and then my correspondence with Rachel,

11         then Cory.  And then I believe after the article,

12         there was other media outlets who then contacted

13         the office.

14              MR. LAMBERT:  What article?  You

15         say "the article".

16              THE WITNESS:  On February the

17         13th, I believe.

18   Q.    Cory's article?

19   A.    Yeah.

20   Q.    You knew that when Cory published the article,

21         when somebody published the article, that TV

22         stations would contact you, correct?

23   A.    You never know.

24   Q.    You never know, but you -- you had a pretty good

25         idea, didn't you?

1    A.   But, no, you never know.  You do this, you don't

2         know.

3    Q.   Okay.

4    A.   But this TV station was already involved.

5    Q.   And you reached out to Peggy Gallek of Fox 8,

6         correct?

7    A.   Reached out when?

8    Q.   Some point in January or February of 2017.

9    A.   No, I had indicated earlier that she had been

10        calling.  Fox 8 had been calling this office.

11   Q.   How about Mark Gillespie, of the Associated

12        Press?

13   A.   Gillespie.

14   Q.   Yeah.

15   A.   AP, yeah.

16   Q.   You called him, right?

17   A.   I believe he called us.

18   Q.   When did he call you?

19   A.   After the story that -- after Cory's story ran, I

20        believe.

21   Q.   Okay.  And Megan Hickey of News 5?

22   A.   What's your question?

23   Q.   You contacted her, correct?

24   A.   I believe -- I don't know if -- I don't recall.

25        I think Channel 5 had been -- had been contacting

```
1        this office, not Megan Hickey, but it was

2        Katherine -- I think it was Katherine Volk.

3                      MR. LAMBERT:  Kristin Volk.

4   A.   Kristin Volk.

5   Q.   So there was Peggy, there was Cory, there was

6        Rachel, there was Mr. Gillespie, and there was

7        Ms. Hickey, and I'm sorry the other?  Volk?

8   A.   Katherine, yeah.

9   Q.   Katherine, what's her --

10                     MR. LAMBERT:  Kristin.

11  A.   Kristin.

12  Q.   Kristin Volk?

13  A.   Channel 5.

14  Q.   How do you spell that?

15  A.   I don't know.  V-o-l-k, maybe.  I don't know.

16  Q.   Okay.  Is there any other reporter that the

17       office communicated with about this case?

18  A.   Ideastream had contacted us.

19  Q.   And you made contact with them, as well, right?

20  A.   What do you mean, I made contact?

21  Q.   You spoke with someone from Ideastream, correct?

22  A.   Did I speak or did I e-mail?

23  Q.   Communicated.

24  A.   Communicated, yes, I believe we did, yes.

25  Q.   Okay.  And you communicated with all of these
```

1      reporters about the case, correct?

2   A.  Yes.

3   Q.  So when you contacted these reporters, what

4       investigation --

5                MR. LAMBERT:  Objection.

6   A.  No.

7                MR. LAMBERT:  Misstates the

8           evidence.

9   Q.  I'm sorry, when you communicated with these

10      reporters, please tell me what you had done to

11      investigate the story before you communicated

12      with the reporters about it.

13  A.  I don't understand your question.  You're asking

14      if I investigated?

15  Q.  Yes.  What had the office done to investigate the

16      story before communicating with reporters about

17      it?

18  A.  You're talking about uncovering these cases that

19      weren't properly handled?

20  Q.  If that's what it is.

21  A.  Yeah, there was -- the office investi -- looked

22      at these cases, and found that, again, starting

23      with Fox -- or Fox 8 calling, Channel 5 calling

24      about the Cleveland Heights case, that then led

25      to finding other cases that weren't properly

```
 1           handled, the office then did a thorough

 2           investigation into them.

 3    Q.   What do you know about that investigation?

 4    A.   As I just -- I mean, I just characterized it.

 5    Q.   Could you --

 6    A.   Chain of events.

 7    Q.   Could you say anything else about the

 8           investigation that was performed?

 9    A.   I was not pa-- I wasn't involved in the

10           investigation.

11    Q.   Do you know how much time the office spent on

12           verifying what had happened with these cases

13           before contacting reporters?

14    A.   How much time?

15    Q.   Yes.

16    A.   You're talking about minutes, hours, days?

17    Q.   Either way.

18    A.   I can't say definitively.  I would say that a

19           considerable amount of time was spent.

20    Q.   What's that?

21    A.   A considerable amount of time.

22    Q.   What is a considerable amount of time?  How much

23           time do you believe was spent?

24    A.   Hours, hours upon hours.

25    Q.   Okay.  Do you know if the office spoke with
```

```
 1        Mr. Deskins before going to the press about this
 2        case?
 3   A.   I don't know.  I don't believe so.
 4   Q.   Do you know what, if anything, was done to verify
 5        whether the 76 cases that were reported as
 6        mishandled, were actually mishandled?
 7   A.   I just characterized how we -- the investigation.
 8   Q.   You don't have anything to add to that?
 9   A.   Add to what?
10   Q.   You said -- your characterization?
11   A.   That the office thoroughly investigated, no.
12   Q.   So the prosecutor's office eventually met with
13        Cory Shaffer, correct?
14   A.   Yes.
15   Q.   Do you remember that meeting?
16   A.   I was in that meeting.
17   Q.   Were you in the meeting with Rachel, too?
18   A.   What meeting are you referring to?
19   Q.   Okay.  So you don't remember meeting with Rachel?
20   A.   What meeting are you referring to, Pete?
21   Q.   There was a meeting with Rachel about the same --
22   A.   What meeting?
23   Q.   -- issue that you had a meeting with Cory with,
24        correct?
25   A.   I don't recall that.
```

1  Q.  Okay.  What happened at the meeting with Cory?

2  A.  Channel 8 and Cory were present.  And it was kind

3      of, what do you call it, like a round robin,

4      where we pulled together a group of people who

5      talked to the media about cases not being

6      properly handled.

7  Q.  Who was all at this meeting?

8  A.  Joanna, Jennifer Driscoll, Prosecutor O'Malley.

9              MR. LAMBERT:  What's Joanna's full

10          name?

11             THE WITNESS:  Whinery.

12  A.  Prosecutor O'Malley, Lisa Williamson, first

13      assistant, Russ Tye, Diane -- Diane Russell.  And

14      I'm thinking I'm missing one person, I don't know

15      if Maggie was there.  No.

16  Q.  Was Mr. Mussman there?

17  A.  Yes.

18  Q.  What was said to Cory Shaffer at this meeting?

19  A.  It was a discussion about these cases not being

20      properly handled.

21  Q.  Do you remember anything more specifically than

22      that?

23  A.  I mean, that was the general -- that's the

24      general conversation about this story, which was

25      these cases not being properly handled.

1   Q.   Do you remember any specifics?

2   A.   As far as the actual cases themselves?

3   Q.   Yes.

4   A.   I know that there was one case in particular

5        where somebody re-offended.  Another one was

6        where it was a sexual assault in the home.

7   Q.   Do you remember anything else about what was

8        discussed with Mr. Shaffer?

9   A.   I think we talked about obviously how -- how this

10       -- you know, how this came to be, as far as

11       uncovering these cases.

12  Q.   And what was said about that?

13  A.   I'll restate that Channel 8 and Channel 5 had

14       been starting to call about the Cleveland Heights

15       case.  And that led into, I believe it was a rape

16       crisis center notifying us, and us finding these

17       cases that weren't properly handled.

18  Q.   Do you recall what was said about how it was

19       determined that these cases weren't properly

20       handled?

21  A.   I don't recall the details.  But the story was,

22       you know, these cases weren't properly handled.

23       We had victims out there.  Cases weren't

24       prosecuted or cases were not referred to the

25       proper agency.

1   Q.  Do you remember anything else about it?

2   A.  Anything else, what do you mean by --

3   Q.  Anything else about how these cases weren't --

4   A.  No, because like I --

5   Q.  -- properly handled?

6   A.  I think, again --

7   Q.  And was what -- I'm sorry, what was communicated

8      to Cory about how these cases were not properly

9      handled?

10  A.  They weren't -- they weren't reviewed.  They

11     weren't prosecuted.  They weren't referred to

12     social agencies.  Like I said, I think it was a

13     16-year-old, and I think it was a 6-year-old

14     victim in the same home; nothing was done.

15     Nothing was done on that case.  So you had a

16     victim out there that no one -- you had a victim

17     out there, that's one case.

18  Q.  Do you remember what was said about the

19     prosecutors who were determined to be

20     responsibile for the alleged failures?

21  A.  I don't know if we got into details about any --

22     any specific prosecutor.  The story was -- and

23     again, I'll state, the story was, these cases

24     weren't properly handled.

25  Q.  So you don't remember any details that were said

1      about any of the prosecutors who were disciplined

2      for this?

3  A.  I don't recall.  I don't recall if it was

4      discussed or what was discussed with respect to

5      the prosecutors.  Again, this story was about

6      these cases not being properly handled.

7  Q.  Did the office give Cory Shaffer any documents

8      about this story?

9  A.  He -- he request -- he requested documents

10     pertaining to the disciplinary records of all

11     seven.  And I don't recall, but I would have -- I

12     would have made copies for him to either read

13     there or take with him, but I don't believe he

14     took anything with him.

15 Q.  All seven what?

16 A.  All seven individuals.

17 Q.  Which individuals?

18 A.  Who were disciplined.

19 Q.  Who were disciplined in connection with the

20     mishandled cases that were the subject of this

21     story?

22 A.  Correct.

23 Q.  Okay.  Did the names of these individuals come up

24     in the meeting?

25 A.  Like I said before, I don't believe so.  I don't

1       recall.

2   Q.  But you provided the disciplinary files to

3       Cory --

4   A.  Yeah, per public records request, yes --

5   Q.  -- before --

6   A.  -- which is also pretty -- pretty common that a

7       reporter asks for such files.

8   Q.  Okay.  Do you know at the time this meeting with

9       Cory took place whether the prosecutor's office

10      knew how many cases Ms. Hoffman and Ms. Herman

11      had allegedly mishandled?

12  A.  The -- that wasn't -- the focus of the meeting

13      with the media was about these cases.

14  Q.  So --

15  A.  That was my -- that was my -- that was my -- you

16      know, my understanding of -- my role here was to

17      communicate about these cases being -- not being

18      properly handled.

19                        -  -  -  -

20          (Thereupon, Plaintiff's Exhibit 3 was marked

21          for purposes of identification.)

22                        -  -  -  -

23  Q.  I'm going to hand you what I have marked as

24      Exhibit 3.

25          Could you identify this document, please?

1    A.   It's an article by Cory.

2    Q.   This is the story that Cory eventually published,

3         correct?

4    A.   The story that he published?

5    Q.   On February 13th, 2017?

6    A.   Yes.

7    Q.   On the second page --

8    A.   Now, there's -- you know, they updated this story

9         on February 14th, so which version are we looking

10        at?

11   Q.   Well, if it notes that it's updated on

12        February 14th --

13   A.   February 14th.

14   Q.   Right.  Okay.  We're looking at the updated

15        version.

16   A.   Yeah.

17   Q.   Excuse me.  If you go about two thirds down,

18        about six paragraphs from the bottom it says, the

19        prosecutors eventually uncovered 76 cases,

20        including 37 reported rapes and 32 reports of

21        gross-sexual imposition, that were never fully

22        reviewed for charges.

23              MR. LAMBERT:  Which -- you are on

24           page --

25              MR. PATTAKOS:  Page 2.  Right

1              here, Dave.

2                        MR. LAMBERT:  Okay.

3    Q.   Am I reading that correctly?

4    A.   Yes, you're reading that correctly.

5    Q.   Okay.  You believe that that was accurate as of

6         the time of the report, correct?

7    A.   Yep.

8    Q.   Okay.  On the third page, under discipline it

9         says, O'Malley last week asked three assistant

10        prosecutors who handled the bulk of the delayed

11        cases to resign.  Am I reading that correctly?

12   A.   Yeah, you're reading it correctly.

13   Q.   Do you recall what was said about that in the

14        meeting with Cory?

15   A.   No, I don't recall.  Again, I don't recall the

16        details of -- of individuals being discussed at

17        this meeting.  The focus of the meeting was these

18        cases, Pete --

19   Q.   Do you know --

20   A.   -- I don't know how else --

21   Q.   Okay.  Did you know that Laura and Linda only

22        ever handled seven of the allegedly mishandled

23        cases?

24                        MR. LAMBERT:  Objection.  We're

25             talking about three prosecutors.

1    Q.   Do you know that?

2    A.   Restate the question.

3    Q.   Do you know that Laura and Linda only ever

4         handled seven of these allegedly mishandled

5         cases?

6    A.   That they only handled, you said, seven of these

7         cases?

8    Q.   Did you ever know that?

9    A.   Did I ever know that?  At some point, yes.

10   Q.   When did you know that?

11   A.   I don't recall.  Obviously, in preparation for

12        the meeting, but when specifically, I don't know.

13   Q.   Would you agree that if Laura and Linda handled

14        seven of the allegedly mishandled cases, they

15        didn't handle the bulk of the delayed cases,

16        correct?

17   A.   Say that again.

18   Q.   It says here -- I'll ask you a different

19        question.  You could see where it says, under

20        discipline --

21   A.   Yeah.

22   Q.   -- O'Malley asked three assistant prosecutors who

23        handled the bulk of the delayed cases to resign?

24   A.   Yeah, that's three assistant prosecutors who

25        handled the bulk of the delayed cases.

1   Q.   You understand that Laura and Linda, if they only

2        handled seven of these cases --

3   A.   But they're talking about three here.

4   Q.   I understand that.

5   A.   That includes Robin.

6   Q.   Okay.  Do you think that's fair?

7   A.   That -- what do you mean what's fair?  Are you

8        asking me -- are you asking me if this is

9        accurate?

10  Q.   No.

11  A.   That's not what you're asking me?

12  Q.   I'm asking you if you think it's fair to say that

13       Laura and Linda handled the bulk of the delayed

14       cases if they only handled seven?

15  A.   Cory writes here that there are three assistant

16       prosecutors who handled the bulk of the delayed

17       cases.  That's what he writes here.

18  Q.   Uh-huh.

19  A.   But you're not asking me that?

20  Q.   No.

21  A.   I'm saying that this is -- this is accurate what

22       Cory wrote.

23  Q.   Okay.  You had some follow-up communications with

24       Cory after the meeting, correct?

25  A.   He contacted us.

1   Q.  After the article was published, correct?

2   A.  Correct.

3   Q.  Do you remember what Cory followed you up --

4       followed up with you on?

5   A.  There was a number of e-mails, I believe.

6   Q.  What do you remember about that?

7   A.  He asked a series of questions.

8   Q.  Do you remember what he wanted to know?

9   A.  The specific question, no.

10  Q.  Do you remember anything about what Cory wanted

11      to know when he followed up with you?

12  A.  Like I said, he asked a series of questions.  If

13      you've got the document, I could -- I could refer

14      to it.

15  Q.  You don't remember anything?

16  A.  I said, if you got the document, I could refer to

17      it.

18  Q.  I'm asking if you remember anything.

19  A.  Remember anything about the series of questions

20      that he asked?

21  Q.  Yeah.  What Cory followed up with you on.

22  A.  I know that there was, I think about the nature

23      of the investigation.  But, again, if you have

24      the document, I could refer to that.

25  Q.  I want to know what you remember first.  So have

1           you exhausted your memory?

2    A.    I didn't exhaust my memory.  I'm asking if you

3           have the document that I could refer to.

4    Q.    Okay.  I don't want you to refer to a document, I

5           want to know what you remember, okay?

6    A.    And I just indicated that he was following up on

7           the investigation of --

8    Q.    Okay.  And then you said you haven't exhausted

9           your memory, so let's go ahead and exhaust it.

10   A.    Well, if you're referring to a document, how

11          about you give me the document?

12   Q.    Sir, I'm not referring to a document, I'm

13          referring to your communications with Cory after

14          Cory's article was published, what do you

15          remember about --

16   A.    And I said that --

17   Q.    -- those communications?

18   A.    I said that he followed up via e-mail with a

19          series of questions, yes.

20   Q.    And what was he asking about?

21   A.    And I said that if you've got the document, which

22          I'm sure you do, I could refer to it and answer

23          your questions.

24   Q.    What was Cory asking you about?

25   A.    I just said earlier, he's asking about the

1      investigation of these cases.

2   Q.  What about the investigation?

3   A.  He sent a series of e-mails subsequent to his

4       story that he wrote, okay?  I'm sure you have the

5       e-mails.  If you want to give me those, I could

6       answer those questions.

7   Q.  So you don't remember anything --

8   A.  I didn't say that.  I said he communicated with

9       us via e-mail on a number of occasions with a

10      series of questions.

11  Q.  You don't remember anything else about what Cory

12      asked you about, other than what you've already

13      testified?

14  A.  Which was about following up on the investigation

15      of these cases.

16  Q.  Yes.

17  A.  And what's your question?

18  Q.  Do you remember anything else?

19  A.  Anything else, what do you mean?  I said -- I

20      said what I remember.  Do you have the document

21      or not?  I could refer to it.

22                   -   -   -   -

23          (Thereupon, Plaintiff's Exhibit 4 was marked

24          for purposes of identification.)

25                   -   -   -   -

1  Q.  Okay.  I'm going to hand you what's been marked

2      as Exhibit 4.  Do you remember this?

3  A.  Yes.

4  Q.  These are some of the items that Cory followed up

5      with you on, correct?

6  A.  Yeah, this is February -- this is February 15th.

7  Q.  This is an e-mail that you received from Cory,

8      correct?

9  A.  Yeah, on February 15th, at 9:46 a.m.

10 Q.  You and Ms. Caffrey, correct?

11 A.  Yes.

12 Q.  And Cory writes first, hey, guys, I have a few

13     follow-up questions for the juvenile division

14     story.

15         Number one, how many of the 76 sex offense

16     cases your office identified as needing review

17     were assigned to each APA who was forced to

18     resign; Laura Hoffman and Linda Herman?

19         Why is he asking you this now?

20 A.  I think he was -- I think he was contacted at

21     some point by either one of them or both of them

22     or others about this story.

23 Q.  Did the office not provide this information to

24     Cory before the article was published?

25 A.  What information?

1  Q.  In this question number one here.

2  A.  Well, he wrote in his story, which I said was

3      accurate that three assistant prosecutors who

4      handled the bulk of the delayed cases, in fact,

5      there was seven that was discipline.  But that is

6      an accurate statement.  So he got that from this

7      office.

8  Q.  But Cory is asking you here specifically how many

9      of the 76 cases Laura and Linda had handled,

10     correct?

11 A.  That's what he's asking.

12 Q.  Yeah.  And he's asking that because the office

13     did not provide him with this information at the

14     meeting prior to him publishing the story,

15     correct?

16                  MR. LAMBERT:  Objection.

17 A.  I can't answer that.  I don't --

18 Q.  You don't know?

19 A.  We didn't engage Cory.  These series of

20     questions, we didn't engage him.  We made -- I

21     think we gave a short statement.  But clearly

22     from this e-mail, Pete, he's going down the road

23     of talk -- wanting to talk about employees, and

24     we weren't going to do that.

25 Q.  Explain that.

1   A.   I mean, I -- what don't you understand about

2        that?

3   Q.   What do you mean, you were not going to talk

4        about employees, you already provided him

5        disciplinary files for employees?

6   A.   Per public records request.

7   Q.   Okay.  He also asks you what the higher date was

8        of those APAs.

9             Do you know why he is asking you for that?

10  A.   Again, we weren't engaging Cory with all these

11       questions.

12  Q.   You didn't engage him?

13  A.   No, I said that we weren't going to.  After this

14       story was published and he followed up with these

15       questions, and then I think he sent us subsequent

16       e-mails with I think more questions, we weren't

17       engaging it.

18            Because clearly, clearly if you're reading

19       this, he's going down the path of wanting to

20       specifically talk about employees that were

21       disciplined, and we weren't -- we issued a very

22       short statement, which we issued to other media

23       stations who followed up, as well.  And that's

24       all.

25  Q.   You didn't end up providing him with this

```
 1        information that he wanted to know?
 2   A.   I said that when he came over per a public
 3        records request, I think for the personnel file,
 4        I either made a copy, that he reviewed there, or
 5        he took it with him.
 6   Q.   But you didn't otherwise engage with him on this
 7        information request?
 8   A.   Engage when?
 9   Q.   Ever.
10   A.   What do you mean "ever"?
11   Q.   I'm asking you --
12   A.   You're asking me -- this is an e-mail after the
13        story published.
14   Q.   Yes, sir.
15   A.   This would be -- just to be clear about the
16        timeline.
17   Q.   Yes, sir.
18   A.   Okay.
19   Q.   Yes.
20   A.   And I stated and I'll state again, we didn't
21        engage him.  We weren't going to go through all
22        these questions with him, because clearly where
23        he wants to go with this is he wants to talk
24        about individual employees, and we weren't -- we
25        weren't -- and we issued the short statement,
```

1       which I'm sure you have, I could point that out.

2                       MR. PATTAKOS:  Let's take a

3               five-minute break.

4                       MR. LAMBERT:  Okay.

5                       MR. PATTAKOS:  And we're almost

6               done.  I'm optimistic we'll be done by

7               1:00.

8                       THE VIDEOGRAPHER:  We're going off

9               the record.  The time is 12:23.

10                          -  -  -  -

11                  (Thereupon, a recess was had.)

12                          -  -  -  -

13                      THE VIDEOGRAPHER:  We're back on

14              the record.  The time is 12:35.

15  Q.  Since it came up on the break, I didn't ask you

16      what your education credentials are.  Could you

17      please just go over that briefly?  Where did you

18      go to high school and college and any graduate

19      degree that you've received?

20  A.  I went to high school, Massillon Perry High

21      School, John Carroll, and then Columbia for

22      graduate school, and -- yeah.

23  Q.  What did you -- what are your degrees that you

24      got from John Carroll and Columbia?

25  A.  Oh, god, what was it?  Sociology, and then at

1      Columbia was psychology, psychology and higher

2      education.

3   Q.  You got a master's there?

4   A.  Yeah.

5   Q.  How did you get into the press business?

6   A.  I started actually writing for the Columbia

7      Spectator, which kind of got me into the media.

8      And then I'm trying to think how I connected with

9      Giovanni Puello.  But we did -- we had done some

10     work at Columbia around -- with candidates for

11     office, bringing them on campus.  So that's kind

12     of -- that was my foray into that.  And then that

13     led to, like I said, working on campaign and then

14     eventually working with state -- state official.

15  Q.  Okay.  Thank you.  Back to the -- back to the

16     case.

17                    -  -  -  -

18     (Thereupon, Plaintiff's Exhibit 5 was marked

19        for purposes of identification.)

20                    -  -  -  -

21  Q.  I am going to hand you what has been marked as

22     Exhibit 5.

23     Do you recognize these documents -- or this

24     document, I should say?

25  A.  Yeah, from Cory to me.

1   Q.  These are e-mails that you exchanged with Cory,

2       correct?

3   A.  Cory to me and then me to Cory.

4   Q.  Okay.  And you sent and received these e-mails,

5       correct?

6   A.  Correct.

7   Q.  Okay.  Cory says, hey, Ryan, on March 17th, 2017,

8       I got an e-mail from one of the juvenile

9       prosecutors who resigned that says both of the

10      APA combines had only 7 of the 76 un-reviewed sex

11      crimes cases and none of the inactive cases.  Is

12      that accurate?  If so, I need an on-the-record

13      response from you guys explaining why they were

14      made to resign.

15          Am I reading that correctly?

16  A.  Yes, you're reading that correctly.

17  Q.  You respond, hi, Cory, Mike said if her admission

18      is true, ignoring seven sexual assaults against

19      children in the county prosecutor's office will

20      never be acceptable, Ryan.  Did I read that

21      correctly?

22  A.  Yeah.

23  Q.  Was that your response?

24  A.  To Cory, yes.

25  Q.  Was that the office's response?

1   A.   Yes.

2   Q.   Did the office ever make any other response to

3        this question by Cory?

4   A.   To this -- to this specific question?

5   Q.   Yes.

6   A.   He asked -- he sent it -- like I said earlier, he

7        sent several, I think follow-ups with series of

8        questions.  I think there was one other comment

9        we made to him, but we also made similar comments

10       to other media.

11  Q.   But did you ever respond to this e-mail from Cory

12       in any other way?

13  A.   This specific, I don't -- I don't -- I don't

14       believe so.

15  Q.   Okay.  And no one else at the office did either,

16       right?

17  A.   You are asking me if I -- did I respond in any

18       other way than this?

19  Q.   Did you or anyone at the office respond, is what

20       I'm asking now?

21  A.   No, I don't believe so. But, again, as I stated

22       earlier, we issued a short statement to, I think

23       Ideastream, you know, AP, as I indicated they had

24       followed up.  Fox 8 was there that day.  I'm

25       trying to think of any -- and then there was

```
 1        another comment that we made to -- I think we

 2        provided Cory.

 3   Q.   In this e-mail when you say "Mike said", you're

 4        referring to Mr. O'Malley, correct?

 5   A.   Correct.

 6   Q.   So you spoke with Mike about a response to this

 7        e-mail?

 8   A.   Yeah.

 9   Q.   Mr. O'Malley?

10   A.   Uh-huh.

11   Q.   Okay.  And this is what he told you to say,

12        correct?

13   A.   I don't know, did he told me to say it or did I

14        recommend it to him?

15   Q.   This is what he authorized?

16   A.   But this -- Yes.

17                        -  -  -  -

18        (Thereupon, Plaintiff's Exhibit 6 was marked

19        for purposes of identification.)

20                        -  -  -  -

21   Q.   I'm going to hand you Exhibit 6.  This is the

22        follow-up statement that you're referring to, the

23        response to this e-mail from Cory, correct?

24   A.   No.  State your question, again.

25   Q.   Why don't you give it a look.
```

1    A.   Okay.  So I've got here, Cory contacts me, did

2         you guys -- did you guys get the number of the

3         sex crime cases that were assigned?

4    Q.   And this is a few days later, right?  This is on

5         March 21st, 2017?

6    A.   March 21st?

7    Q.   Yes.

8    A.   So the story runs February 13th.

9    Q.   Uh-huh.  I mean, this is a few days after Cory

10        sent you the last e-mail on the 17th of March.

11   A.   Yeah, he sent an e-mail on the 17th of March.

12        And then Exhibit 6, he sent on the 21st of March.

13   Q.   Right.

14   A.   Which is a considerable amount of time since he

15        published the story --

16   Q.   Yes.

17   A.   -- on February 13th.

18   Q.   Yes.  And you received this e-mail from Cory,

19        correct?  It says, hey, man, did you guys get the

20        numbers of the sex crimes cases --

21   A.   Yes.

22   Q.   -- that were assigned to Herman and Hoffman yet?

23   A.   Correct.

24   Q.   And then the next page shows a response from

25        Ms. Caffrey, correct?

1   A.   Yeah.  Is it 3/21?

2   Q.   Yes.

3   A.   3/21.

4   Q.   Yes, 2:18 p.m.?

5   A.   Yeah.  Correct.

6   Q.   And it says statement from Cuyahoga County

7        Prosecutor's office.

8   A.   Uh-huh.

9   Q.   It is Prosecutor O'Malley's belief that neglect

10       in even one sexual assault case is unacceptable.

11       Our office policy is not to discuss personnel

12       issues in the media.  The work performed by these

13       employees was clearly deficient.  When confronted

14       with that fact, they made a point to resign.

15                  MR. LAMBERT:  Choice.

16                  MR. PATTAKOS:  Choice, thank you.

17  Q.   Is that correct?  Did I read that correctly?

18  A.   You read that correctly.

19  Q.   Did you discuss this response with Mr. O'Malley?

20  A.   Yes, I believe I did.

21  Q.   And this was the response that he authorized,

22       correct?

23  A.   Either -- that I either recommended or that he

24       authorized in the end, yes.

25  Q.   Well, he would have had to authorize it in the

```
 1        end, right?

 2   A.   In the end, yes.

 3   Q.   You didn't make any statements on the office's

 4        behalf without being assured that Mr. O'Malley

 5        had authorized them, correct?

 6   A.   That is my attempt when media contact is always

 7        to seek authorization from Mr. O'Malley.  Does

 8        that always happen?  We get a lot of media call.

 9   Q.   But that happened here, right?

10   A.   Yes, I believe it did.

11   Q.   Okay.  So on March 21st, at 3:12 p.m., Cory

12        responds to Kathy, and says, thanks, Kathy, but I

13        thought Mike said during the first interviews

14        that he asked for their resignations.  Am I

15        reading that correctly?

16   A.   You're reading that correctly.

17   Q.   And there was never any response to this,

18        correct?

19   A.   I don't -- as I said earlier, he followed up with

20        a series of questions, including the onces you've

21        referenced here.  And we weren't -- we weren't

22        going to engage, because clearly the path he was

23        going down was that these employees -- we didn't

24        want to trash -- we didn't want to trash them in

25        the media.
```

1          So I think that's all -- I think that's all

2     we -- I think we responded -- I think we issued

3     him another response, a very short response.  But

4     was it in relation to this, I don't know.  I'm

5     sure it's in one of the e-mails.

6  Q.  Well, the truth is, he was giving you a re -- a

7     chance to not trash them, but to restore their

8     reputations, right?

9  A.  He wrote -- he published an article, and we

10    weren't going to trash these folks by engaging

11    with him.

12 Q.  But they had already been trashed, hadn't they,

13    sir?

14 A.  I disagree with that.

15 Q.  Well, he was asking to -- he was asking you for

16    clarification that they had only handled seven of

17    these cases, and that would have been a

18    restoration of their reputation; would it not

19    have been?

20 A.  I disagree with that.

21 Q.  Why?

22 A.  We -- he published his story.  And we weren't

23    going to engage with him on a series of questions

24    about employees.  And as the statement says,

25    which is consistent, we -- our office policy is

1      not to discuss these personnel issues in the

2      media.

3   Q.  Do you have anything else to say on that?

4   A.  No.  No.

5                        -  -  -  -

6       (Thereupon, Plaintiff's Exhibit 7 was marked

7        for purposes of identification.)

8                        -  -  -  -

9   Q.  I am going to hand you what has been marked as

10     Exhibit 7.

11  A.  It looks like it's three pages to an article and

12     then four pages of ads.

13  Q.  Do you recognize it?

14                  MR. LAMBERT:  Read it.

15  A.  Recognize what?

16  Q.  The document.

17  A.  It's four pages of ads.

18  Q.  Okay.

19  A.  I see a story from -- written by Mark Gillespie.

20  Q.  And he's with the Associated Press?

21  A.  Correct.

22  Q.  Why don't you take your time and give the

23     document a read.

24  A.  Okay.  Okay.

25  Q.  You're the one that communicated with

1       Mr. Gillespie, right?

2   A.  Mr. Gillespie contacted -- I believe he contacted

3       the office.

4   Q.  Did you speak with him?  I believe you testified

5       before that you did.

6   A.  Yeah.

7   Q.  It's on the top of the second page of this

8       document it says, charges have been filed in

9       about a dozen of the 70 cases thus far.

10      Do you know why this 70 number is different

11      from the number of 76 that the office

12      communicated to Mr. Shaffer, that was reported on

13      cleveland.com?

14  A.  I can't speak to why Mark reported 70.

15  Q.  Okay.

16                      -  -  -  -

17      (Thereupon, Plaintiff's Exhibit 8 was marked

18          for purposes of identification.)

19                      -  -  -  -

20  Q.  This is the last exhibit, Exhibit 8.  Do you

21      recognize this article?

22  A.  It looks like Tom Meyer, Channel 3.

23  Q.  This is an article that was published by WKYC,

24      correct?

25  A.  Yes.

1    Q.   Could you look at the second page of this

2         article?

3                        MR. LAMBERT:  Read it.

4    Q.   Take your time.  Sure.

5                        MR. LAMBERT:  I'm going to raise

6              this issue, Peter.  I don't think we've

7              ever seen this article before.  Have you

8              ever produced it to us in discovery?

9                        MR. PATTAKOS:  I don't know if we

10             have.  You have never seen this before?

11                       MS. POORE:  No.

12                       MR. LAMBERT:  I don't think I

13             have.

14                       MS. POORE:  This is not one of the

15             articles that you cited.

16                       MR. PATTAKOS:  Are you disputing

17             that his article was published?

18                       MR. LAMBERT:  I'm talking about

19             what you produced to us in discovery,

20             that's what I'm talking about.

21                       MR. PATTAKOS:  I can't say whether

22             this was produced or not.  But I'm still

23             entitled to ask him questions about it.

24                       MR. LAMBERT:  Okay.  Yeah, but I'm

25             going to object to -- to this.  And I'll --

1       we'll talk about --

2              MR. PATTAKOS:  I don't know that

3       we have an obligation to produce material

4       that are equally accessible to this office

5       as are to us.

6              MR. LAMBERT:  I don't -- I don't

7       agree.  But I'm just telling you, as far as

8       I know, this was never produced to us.

9              MR. PATTAKOS:  Okay.

10             MR. LAMBERT:  I will tell you, and

11      I could be wrong, but it doesn't look

12      familiar to me.  But I'm just raising that

13      objection.

14             MS. POORE:  Well, it's kind of

15      outside the scope of your -- your

16      paragraph 4, because, you know, this is

17      about the defamatory statements, and you

18      never identified this as being a defamatory

19      article.

20             MR. LAMBERT:  So we'll -- we'll

21      note that objection, and we could continue.

22             MR. PATTAKOS:  Okay.  I just -- I

23      really am just asking about one specific

24      aspect of this document, which is on the

25      second page at the very end, it says --

1          MR. LAMBERT:  Could I ask you to

2       give me a second to read it, I'm sorry?

3          MR. PATTAKOS:  Yep.

4          MR. LAMBERT:  Just real quick.

5       Okay.  Thanks.  I'm ready.

6    Q.  It's says -- on the second page, it says, that

7       the prosecutor's office has filed charges in 22

8       of the 54 sex assault cases initially identified.

9          This article is dated February 23, 2017,

10      which is ten days after Cory's article was

11      published, correct?

12   A.  Yes.

13   Q.  Do you know why this number has gone down from 76

14      to 54?

15   A.  Let me turn back to Cory's article.  I don't know

16      why.  I can't speak to why Tom Myer reported on

17      that number.  It says, initially identified.

18      But, again, I can't speak to why Tom reported on

19      -- on that number.

20          MR. PATTAKOS:  Okay.  Thank you,

21      sir.  I appreciate it.

22          THE WITNESS:  Okay.  Thank you.

23          MR. PATTAKOS:  No further

24      questions.

25          THE VIDEOGRAPHER:  We're going off

1           the record.  The time is 12:54.

2                   MR. LAMBERT:  We're going to read.

3       Okay.  Thanks.

SIGNATURE OF DEPONENT

I, the undersigned, RYAN MIDAY, do
hereby certify that I have read the foregoing
deposition and find it to be a true and
accurate transcription of my testimony, with
the following corrections, if any:

PAGE    LINE        CHANGE            REASON

_____
Ryan Miday

1

C E R T I F I C A T E

2

3

The State of Ohio, )   SS:
4     County of Cuyahoga.)

5

6         I, Chana Margareten, a Notary Public within
and for the State of Ohio, authorized to
7     administer oaths and to take and certify
depositions, do hereby certify that the
8     above-named witness was by me, before the giving
of their deposition, first duly sworn to testify
9     the truth, the whole truth, and nothing but the
truth; that the deposition as above-set forth was
10    reduced to writing by me by means of stenotypy,
and was later transcribed by computer-aided
11    technology under my direction; that this is a
true record of the testimony given by the
12    witness; that said deposition was taken at the
aforementioned time, date and place, pursuant to
13    notice or stipulations of counsel; that I am not
a relative or employee or attorney of any of the
14    parties, or a relative or employee of such
attorney or financially interested in this
15    action; that I am not, nor is the court reporting
firm with which I am affiliated, under a contract
16    as defined in Civil Rule 28(D).

17        IN WITNESS WHEREOF, I have hereunto set my
hand and seal of office, at Cleveland, Ohio, this
18    ____ day of _____, A.D. 20 ___.

19

20    _____
Chana Margareten, Notary Public, State of Ohio
21    55 Public Square, Suite 1332
Cleveland, Ohio 44113
22    My commission expires March 10, 2021

23

24

25

**'** 

**'08** [1] - 6:10
**'96** [1] - 8:19

# 1

**1** [4] - 3:5, 12:18, 12:22, 24:23
**10** [1] - 68:22
**101** [1] - 2:3
**10th** [1] - 25:9
**11:28** [2] - 1:15, 4:2
**12** [1] - 3:5
**1200** [2] - 1:13, 2:8
**12:23** [1] - 52:9
**12:35** [1] - 52:14
**12:54** [1] - 66:1
**1332** [2] - 1:20, 68:21
**13th** [4] - 30:17, 41:5, 57:8, 57:17
**14** [2] - 1:15, 4:3
**14th** [3] - 41:9, 41:12, 41:13
**15th** [2] - 48:6, 48:9
**16-year-old** [1] - 38:13
**17th** [3] - 54:7, 57:10, 57:11
**1:00** [1] - 52:7
**1:18-CV-00309** [2] - 1:5, 4:9

# 2

**2** [4] - 3:6, 24:20, 24:24, 41:25
**20** [1] - 68:18
**2000** [1] - 6:10
**2000s** [2] - 8:11, 8:13
**2004** [1] - 8:19
**2006** [2] - 8:13, 8:14
**2007ish** [1] - 6:10
**2011** [1] - 6:14
**2017** [10] - 6:1, 6:4, 14:14, 18:3, 18:23, 31:8, 41:5, 54:7, 57:5, 65:9
**2019** [2] - 1:15, 4:3
**2021** [1] - 68:22
**216** [1] - 2:9
**216)664-0541** [1] - 1:21
**21st** [4] - 57:5, 57:6, 57:12, 59:11
**22** [1] - 65:7
**23** [1] - 65:9
**24** [1] - 3:6

**28(D)** [1] - 68:16
**2:18** [1] - 58:4

# 3

**3** [5] - 3:6, 6:1, 40:20, 40:24, 62:22
**3/21** [2] - 58:1, 58:3
**32** [1] - 41:20
**330** [1] - 2:4
**37** [1] - 41:20
**3:12** [1] - 59:11

# 4

**4** [4] - 3:7, 47:23, 48:2, 64:16
**40** [1] - 3:6
**44113** [3] - 1:20, 2:8, 68:21
**44131** [1] - 5:21
**443-7829** [1] - 2:9
**44333** [1] - 2:4
**47** [1] - 3:7

# 5

**5** [10] - 3:3, 3:7, 30:9, 31:21, 31:25, 32:13, 33:23, 37:13, 53:18, 53:22
**53** [1] - 3:7
**54** [2] - 65:8, 65:14
**55** [2] - 1:19, 68:21
**56** [1] - 3:8

# 6

**6** [4] - 3:8, 56:18, 56:21, 57:12
**6-year-old** [1] - 38:13
**61** [1] - 3:8
**62** [1] - 3:9

# 7

**7** [4] - 3:8, 54:10, 61:6, 61:10
**70** [3] - 62:9, 62:10, 62:14
**76** [7] - 35:5, 41:19, 48:15, 49:9, 54:10, 62:11, 65:13
**7666** [1] - 5:21

# 8

**8** [16] - 3:9, 26:3, 27:3, 27:19, 29:3, 29:7, 29:20, 30:9, 31:5, 31:10, 33:23, 36:2, 37:13, 55:24, 62:17, 62:20
**836-8533** [1] - 2:4

# 9

**9/26/73** [1] - 5:19
**911** [1] - 9:9
**9:46** [1] - 48:9

# A

**A.D** [1] - 68:18
**a.m** [2] - 1:15, 48:9
**ability** [1] - 7:2
**able** [1] - 7:6
**above-named** [1] - 68:8
**above-set** [1] - 68:9
**acceptable** [1] - 54:20
**access** [4] - 27:18, 28:9, 28:24, 29:18
**accessible** [1] - 64:4
**according** [1] - 24:7
**accurate** [9] - 12:7, 25:10, 42:5, 44:9, 44:21, 49:3, 49:6, 54:12, 67:6
**accurately** [2] - 7:3, 7:6
**action** [1] - 68:15
**actual** [1] - 37:2
**add** [2] - 35:8, 35:9
**address** [1] - 5:20
**administer** [1] - 68:7
**administration** [3] - 6:2, 6:15, 7:10
**admission** [1] - 54:17
**ads** [2] - 61:12, 61:17
**Advance** [1] - 24:1
**affiliated** [1] - 68:15
**aforementioned** [1] - 68:12
**age** [1] - 5:6
**agencies** [1] - 38:12
**agency** [1] - 37:25
**agree** [2] - 43:13, 64:7
**agreed** [1] - 15:4
**ahead** [3] - 20:21, 21:7, 46:9
**aided** [1] - 68:10

**al** [4] - 1:3, 1:6, 4:7, 4:8
**Albany** [1] - 8:15
**alleged** [2] - 14:12, 38:20
**allegedly** [9] - 14:15, 14:24, 17:15, 19:1, 23:5, 40:11, 42:22, 43:4, 43:14
**almost** [1] - 52:5
**ALSO** [1] - 2:11
**amount** [4] - 34:19, 34:21, 34:22, 57:14
**analyst** [1] - 9:3
**answer** [8] - 11:22, 12:2, 15:9, 21:10, 29:22, 46:22, 47:6, 49:17
**answered** [4] - 14:3, 15:5, 15:9, 15:15
**AP** [2] - 31:15, 55:23
**APA** [2] - 48:17, 54:10
**APAs** [1] - 50:8
**APPEARANCES** [1] - 2:1
**applied** [1] - 10:21
**apply** [1] - 10:22
**applying** [1] - 11:6
**appreciate** [1] - 65:21
**arrange** [1] - 27:2
**article** [20] - 30:11, 30:14, 30:18, 30:20, 30:21, 41:1, 45:1, 46:14, 48:24, 60:9, 61:11, 62:21, 62:23, 63:2, 63:7, 63:17, 64:19, 65:9, 65:10, 65:15
**article"** [1] - 30:15
**articles** [1] - 63:15
**aspect** [1] - 64:24
**assault** [6] - 14:13, 17:16, 23:7, 37:6, 58:10, 65:8
**assaults** [1] - 54:18
**assemblyman** [1] - 7:23
**assigned** [3] - 48:17, 57:3, 57:22
**assistant** [8] - 4:22, 5:2, 36:13, 42:9, 43:22, 43:24, 44:15, 49:3
**associated** [1] - 61:20
**Associated** [1] - 31:11
**assured** [1] - 59:4
**attempt** [1] - 59:6
**attorney** [3] - 5:2, 68:13, 68:14
**authorization** [1] -

59:7
**authorize** [1] - 58:25
**authorized** [5] - 56:15, 58:21, 58:24, 59:5, 68:6

# B

**ball** [1] - 17:9
**beats** [1] - 23:17
**beginning** [1] - 18:2
**behalf** [7] - 1:16, 2:5, 2:10, 4:6, 14:1, 14:11, 59:4
**belief** [1] - 58:9
**between** [1] - 18:22
**Bill** [1] - 6:16
**birthday** [1] - 5:18
**blackout** [1] - 9:9
**bloomberg** [1] - 8:24
**blurry** [1] - 23:25
**bond** [1] - 9:5
**bottom** [1] - 41:18
**boy** [2] - 6:10, 10:17
**BOYKO** [1] - 1:5
**break** [4] - 9:13, 9:19, 52:3, 52:15
**briefly** [1] - 52:17
**bringing** [1] - 53:11
**bulk** [7] - 42:10, 43:15, 43:23, 43:25, 44:13, 44:16, 49:4
**bus** [3] - 11:10, 11:11
**business** [1] - 53:5
**BY** [2] - 3:3, 5:12

# C

**Caffrey** [3] - 17:24, 48:10, 57:25
**campaign** [1] - 53:13
**campus** [1] - 53:11
**candidate** [3] - 7:20, 7:22, 8:6
**candidates** [1] - 53:10
**capital** [1] - 9:4
**careful** [2] - 20:18, 20:22
**Carroll** [2] - 52:21, 52:24
**CASE** [1] - 1:5
**case** [21] - 4:7, 4:8, 16:11, 17:8, 17:11, 17:18, 22:25, 23:9, 23:12, 23:21, 28:17, 32:17, 33:1, 33:24, 35:2, 37:4, 37:15, 38:15, 38:17, 53:16,

58:10
**cases** [57] - 14:13, 17:6, 17:16, 17:20, 17:22, 19:1, 19:4, 23:7, 23:21, 33:18, 33:22, 33:25, 34:12, 35:5, 36:5, 36:19, 36:25, 37:2, 37:11, 37:17, 37:19, 37:22, 37:23, 37:24, 38:3, 38:8, 38:23, 39:6, 39:20, 40:10, 40:13, 40:17, 41:19, 42:11, 42:18, 42:23, 43:5, 43:7, 43:14, 43:15, 43:23, 43:25, 44:2, 44:14, 44:17, 47:1, 47:15, 48:16, 49:4, 49:9, 54:11, 57:3, 57:20, 60:17, 62:9, 65:8
**center** [1] - 37:16
**certain** [2] - 12:1, 20:13
**certified** [1] - 5:9
**certify** [3] - 67:4, 68:7, 68:7
**chain** [1] - 34:6
**Chana** [4] - 1:11, 4:14, 68:6, 68:20
**chance** [1] - 60:7
**CHANGE** [1] - 67:8
**changed** [1] - 9:16
**Channel** [9] - 30:9, 31:25, 32:13, 33:23, 36:2, 37:13, 62:22
**characterization** [2] - 14:23, 35:10
**characterized** [3] - 15:2, 34:4, 35:7
**charges** [3] - 41:22, 62:8, 65:7
**chat** [1] - 9:13
**chatting** [1] - 9:18
**Children** [1] - 18:11
**children** [1] - 54:19
**choice** [2] - 58:15, 58:16
**choose** [2] - 10:6
**Chris** [2] - 24:25
**cited** [1] - 63:15
**city** [2] - 7:17, 8:15
**City** [6] - 7:20, 8:7, 8:16, 8:17, 9:14, 10:24
**Civil** [2] - 5:8, 68:16
**clarification** [1] - 60:16
**clear** [1] - 51:15
**clearly** [6] - 49:21,

50:18, 51:22, 58:13, 59:22
**CLEVELAND** [1] - 1:20
**Cleveland** [12] - 1:14, 2:8, 4:5, 17:7, 17:19, 26:2, 27:2, 28:16, 33:24, 37:14, 68:17, 68:21
**cleveland.com** [8] - 23:18, 23:23, 24:2, 24:3, 27:3, 29:7, 29:21, 62:13
**college** [1] - 52:18
**Columbia** [5] - 52:21, 52:24, 53:1, 53:6, 53:10
**combines** [1] - 54:10
**comment** [3] - 13:2, 55:8, 56:1
**comments** [1] - 55:9
**commission** [1] - 68:22
**common** [1] - 40:6
**communicate** [4] - 16:10, 16:23, 17:2, 40:17
**communicated** [12] - 14:17, 16:7, 32:17, 32:23, 32:24, 32:25, 33:9, 33:11, 38:7, 47:8, 61:25, 62:12
**communicating** [5] - 9:22, 17:14, 18:19, 18:20, 33:16
**communications** [13] - 5:24, 7:9, 9:21, 14:7, 14:11, 16:2, 16:5, 20:11, 28:19, 28:20, 44:23, 46:13, 46:17
**complaint** [1] - 14:16
**computer** [1] - 68:10
**computer-aided** [1] - 68:10
**conflict** [1] - 27:1
**confronted** [1] - 58:13
**connected** [1] - 53:8
**connection** [1] - 39:19
**conscientious** [3] - 20:3, 20:7, 20:16
**considerable** [4] - 34:19, 34:21, 34:22, 57:14
**considered** [1] - 9:17
**consistent** [1] - 60:25
**contact** [8] - 19:14, 30:3, 30:6, 30:22, 32:19, 32:20, 59:6
**contacted** [13] - 19:3,

20:15, 23:11, 28:10, 28:12, 30:12, 31:23, 32:18, 33:3, 44:25, 48:20, 62:2
**contacting** [3] - 28:16, 31:25, 34:13
**contacts** [1] - 57:1
**continue** [1] - 64:21
**contract** [1] - 68:15
**conversation** [1] - 36:24
**copies** [1] - 39:12
**copy** [1] - 51:4
**correct** [47] - 6:21, 14:5, 14:6, 16:15, 17:7, 17:10, 20:4, 21:14, 21:19, 22:10, 22:20, 23:12, 25:25, 30:22, 31:6, 31:23, 32:21, 33:1, 35:13, 35:24, 41:3, 42:6, 43:16, 44:24, 45:1, 48:5, 48:8, 48:10, 49:10, 49:15, 54:2, 54:5, 54:6, 56:4, 56:5, 56:12, 56:23, 57:19, 57:23, 57:25, 58:5, 58:17, 58:22, 59:5, 59:18, 62:24, 65:11
**Correct** [3] - 39:22, 45:2, 61:21
**corrections** [1] - 67:7
**correctly** [12] - 14:19, 42:3, 42:4, 42:11, 42:12, 54:15, 54:16, 54:21, 58:17, 58:18, 59:15, 59:16
**correspondence** [5] - 22:6, 22:7, 22:8, 22:9, 30:10
**Cory** [66] - 23:19, 24:3, 24:5, 24:13, 24:24, 25:10, 25:19, 25:22, 26:1, 26:4, 26:11, 27:4, 27:18, 28:9, 28:20, 28:23, 28:24, 29:15, 29:18, 30:11, 30:20, 32:5, 35:13, 35:23, 36:1, 36:2, 36:18, 38:8, 39:7, 40:3, 40:9, 41:1, 41:2, 42:14, 44:15, 44:22, 44:24, 45:3, 45:10, 45:21, 46:13, 46:24, 47:11, 48:4, 48:7, 48:12, 48:24, 49:8, 49:19, 50:10, 53:25, 54:1, 54:3, 54:7, 54:17,

54:24, 55:3, 55:11, 56:2, 56:23, 57:1, 57:9, 57:18, 59:11
**Cory's** [5] - 30:18, 31:19, 46:14, 65:10, 65:15
**council** [1] - 8:7
**counsel** [3] - 1:16, 4:15, 68:13
**county** [3] - 4:22, 14:17, 54:19
**County** [8] - 1:13, 2:7, 4:4, 14:10, 16:7, 17:14, 58:6, 68:4
**County's** [1] - 14:1
**county's** [1] - 16:5
**course** [1] - 7:18
**court** [15] - 4:10, 4:13, 4:24, 5:4, 19:15, 19:16, 19:19, 19:24, 19:25, 23:19, 23:20, 23:21, 68:15
**COURT** [1] - 1:1
**coverage** [2] - 14:15, 14:21
**covering** [1] - 25:17
**credentials** [1] - 52:16
**crime** [1] - 57:3
**Crimes** [1] - 18:11
**crimes** [2] - 54:11, 57:20
**crisis** [1] - 37:16
**current** [1] - 5:22
**Cuyahoga** [5] - 1:13, 2:7, 4:4, 58:6, 68:4

## D

**date** [2] - 50:7, 68:12
**dated** [1] - 65:9
**Dave** [5] - 4:21, 11:22, 11:25, 12:6, 42:1
**David** [1] - 2:6
**days** [4] - 34:16, 57:4, 57:9, 65:10
**Dealer** [2] - 13:1, 23:18
**dealer** [1] - 23:25
**decision** [2] - 16:10, 16:15
**defamatory** [6] - 14:15, 14:21, 14:24, 15:1, 64:17, 64:18
**Defendants** [2] - 1:7, 2:10
**defendants** [2] - 4:23, 5:3
**deficient** [1] - 58:13
**define** [1] - 20:8

**defined** [2] - 20:16, 68:16
**definition** [2] - 20:18, 20:25
**definitively** [1] - 34:18
**degree** [1] - 52:19
**degrees** [1] - 52:23
**delayed** [7] - 42:10, 43:15, 43:23, 43:25, 44:13, 44:16, 49:4
**denying** [3] - 27:21, 27:23, 27:24
**DEPONENT** [1] - 67:2
**deposed** [1] - 5:10
**deposition** [9] - 1:10, 4:5, 11:16, 11:19, 13:9, 67:5, 68:8, 68:9, 68:12
**depositions** [1] - 68:7
**designated** [4] - 12:14, 13:25, 14:4, 14:9
**Deskins** [1] - 35:1
**details** [4] - 37:21, 38:21, 38:25, 42:16
**determined** [3] - 18:25, 37:19, 38:19
**Diane** [2] - 36:13
**different** [10] - 6:21, 7:11, 13:23, 16:21, 18:9, 23:17, 26:19, 43:18, 62:10
**dinovitz** [1] - 8:12
**Dinovitz** [1] - 7:23
**direction** [1] - 68:11
**director** [4] - 5:24, 7:9, 9:20, 20:11
**disagree** [8] - 14:20, 14:22, 14:23, 14:25, 15:1, 15:2, 60:14, 60:20
**disciplinary** [3] - 39:10, 40:2, 50:5
**discipline** [3] - 42:8, 43:20, 49:5
**disciplined** [4] - 39:1, 39:18, 39:19, 50:21
**discovery** [2] - 63:8, 63:19
**discuss** [3] - 58:11, 58:19, 61:1
**discussed** [4] - 37:8, 39:4, 42:16
**discussion** [1] - 36:19
**disputing** [1] - 63:16
**Dissell** [2] - 19:8, 23:6
**DISTRICT** [2] - 1:1, 1:2
**District** [1] - 4:10
**DIVISION** [1] - 1:2
**division** [2] - 4:11,

48:13
**document** [23] -
12:23, 12:25, 13:5,
13:17, 13:18, 13:22,
14:2, 40:25, 45:13,
45:16, 45:24, 46:3,
46:4, 46:10, 46:11,
46:12, 46:21, 47:20,
53:24, 61:16, 61:23,
62:8, 64:24
**documents** [6] -
21:23, 22:1, 22:4,
39:7, 39:9, 53:23
**done** [10] - 10:23,
29:2, 33:10, 33:15,
35:4, 38:14, 38:15,
52:6, 53:9
**down** [5] - 41:17,
49:22, 50:19, 59:23,
65:13
**dozen** [1] - 62:9
**Driscoll** [3] - 2:12,
23:3, 36:8
**Drive** [1] - 5:21
**duly** [2] - 5:9, 68:8
**during** [1] - 59:13
**duty** [2] - 21:2, 21:5

### E

**e-mail** [19] - 22:6,
24:12, 24:13, 24:24,
25:16, 32:22, 46:18,
47:9, 48:7, 49:22,
51:12, 54:8, 55:11,
56:3, 56:7, 56:23,
57:10, 57:11, 57:18
**e-mailed** [1] - 24:7
**e-mails** [9] - 22:6,
22:8, 45:5, 47:3,
47:5, 50:16, 54:1,
54:4, 60:5
**early** [1] - 8:11
**eastern** [1] - 4:11
**EASTERN** [1] - 1:2
**editor** [1] - 25:1
**education** [2] - 52:16,
53:2
**Eighth** [2] - 1:14, 2:8
**either** [7] - 34:17,
39:12, 48:21, 51:4,
55:15, 58:23
**eligible** [1] - 9:4
**employee** [2] - 68:13,
68:14
**employees** [9] - 49:23,
50:4, 50:5, 50:20,
51:24, 58:13, 59:23,
60:24

**end** [7] - 10:19, 23:15,
50:25, 58:24, 59:1,
59:2, 64:25
**ended** [4] - 21:15,
23:22, 26:1, 27:19
**engage** [9] - 19:7,
49:19, 49:20, 50:12,
51:6, 51:8, 51:21,
59:22, 60:23
**engaging** [3] - 50:10,
50:17, 60:10
**entitled** [1] - 63:23
**equally** [1] - 64:4
**especially** [3] - 9:15,
21:1, 21:4
**Esq** [4] - 2:2, 2:2, 2:6,
2:7
**essentially** [3] - 7:14,
7:15, 10:8
**et** [4] - 1:3, 1:6, 4:7,
4:8
**events** [3] - 7:2, 7:6,
34:6
**eventually** [5] - 19:12,
35:12, 41:2, 41:19,
53:14
**evidence** [1] - 33:8
**exactly** [2] - 20:6,
22:23
**examination** [2] -
1:11, 5:7
**EXAMINATION** [2] -
3:2, 5:11
**exchanged** [1] - 54:1
**exclusive** [3] - 25:20,
25:22, 26:1
**excuse** [1] - 41:17
**exhaust** [2] - 46:2,
46:9
**exhausted** [2] - 46:1,
46:8
**EXHIBIT** [1] - 3:4
**exhibit** [2] - 24:23,
62:20
**Exhibit** [25] - 3:5, 3:6,
3:6, 3:7, 3:7, 3:8,
3:8, 3:9, 12:18,
12:22, 24:20, 24:24,
40:20, 40:24, 47:23,
48:2, 53:18, 53:22,
56:18, 56:21, 57:12,
61:6, 61:10, 62:17,
62:20
**experience** [1] - 10:23
**expires** [1] - 68:22
**explain** [1] - 49:25
**explaining** [1] - 54:13

### F

**fact** [2] - 49:4, 58:14
**failures** [1] - 38:20
**fair** [6] - 10:3, 10:4,
16:9, 44:6, 44:7,
44:12
**Fairlawn** [1] - 2:4
**familiar** [6] - 13:20,
19:14, 19:16, 19:17,
19:18, 64:12
**far** [5] - 26:19, 37:2,
37:10, 62:9, 64:7
**February** [13] - 25:9,
30:16, 31:8, 41:5,
41:9, 41:12, 41:13,
48:6, 48:9, 57:8,
57:17, 65:9
**felt** [1] - 23:20
**few** [3] - 48:12, 57:4,
57:9
**file** [1] - 51:3
**filed** [2] - 62:8, 65:7
**files** [3] - 40:2, 40:7,
50:5
**financially** [1] - 68:14
**financing** [1] - 9:5
**Firm** [1] - 2:3
**firm** [1] - 68:15
**first** [16] - 5:9, 8:2,
10:20, 16:17, 16:22,
17:1, 25:24, 27:18,
28:9, 28:24, 29:18,
36:12, 45:25, 48:12,
59:13, 68:8
**five** [3] - 13:23, 14:5,
52:3
**five-minute** [1] - 52:3
**Floor** [2] - 1:14, 2:8
**focus** [2] - 40:12,
42:17
**folks** [1] - 60:10
**follow** [5] - 24:5,
44:23, 48:13, 55:7,
56:22
**follow-up** [3] - 44:23,
48:13, 56:22
**follow-ups** [1] - 55:7
**followed** [10] - 45:3,
45:4, 45:11, 45:21,
46:18, 48:4, 50:14,
50:23, 55:24, 59:19
**following** [8] - 24:15,
25:6, 25:11, 26:20,
28:3, 46:6, 47:14,
67:7
**follows** [1] - 5:10
**foray** [1] - 53:12
**Force** [1] - 18:12

**forced** [1] - 48:17
**foregoing** [1] - 67:4
**form** [2] - 12:2, 20:12
**forth** [1] - 68:9
**forward** [1] - 9:18
**four** [3] - 14:6, 61:12,
61:17
**Fox** [10] - 26:2, 27:3,
27:19, 29:3, 29:7,
29:20, 31:5, 31:10,
33:23, 55:24
**fox** [1] - 33:23
**Friday** [4] - 1:15, 4:3,
27:15
**full** [1] - 36:9
**fully** [1] - 41:21

### G

**Gallek** [1] - 31:5
**general** [2] - 36:23,
36:24
**generally** [5] - 9:22,
11:21, 12:1, 22:6
**Ghent** [1] - 2:3
**Gillespie** [3] - 31:11,
31:13, 32:6, 61:19,
62:1, 62:2
**Giovanni** [4] - 7:22,
8:3, 8:5, 53:9
**Giuliani** [2] - 8:24,
9:15
**given** [1] - 68:11
**god** [1] - 52:25
**governor** [1] - 10:15
**graduate** [2] - 52:18,
52:22
**Graves** [1] - 4:12
**great** [2] - 9:8, 11:13
**Gregory** [1] - 2:13
**gross** [1] - 41:21
**gross-sexual** [1] -
41:21
**ground** [1] - 20:20
**group** [1] - 36:4
**guess** [1] - 18:2
**guys** [5] - 48:12,
54:13, 57:2, 57:19

### H

**hand** [7] - 12:21,
40:23, 48:1, 53:21,
56:21, 61:9, 68:17
**handle** [1] - 43:15
**handled** [29] - 7:19,
17:20, 33:19, 34:1,
36:6, 36:20, 36:25,

37:17, 37:20, 37:22,
38:5, 38:9, 38:24,
39:6, 40:18, 42:10,
42:22, 43:4, 43:6,
43:13, 43:23, 43:25,
44:2, 44:13, 44:14,
44:16, 49:4, 49:9,
60:16
**HAZELET** [1] - 4:19
**Hazelet** [2] - 2:2, 4:19
**Heights** [4] - 17:7,
17:19, 33:24, 37:14
**heights** [1] - 28:17
**helps** [1] - 15:11
**hereby** [2] - 67:4, 68:7
**hereinafter** [1] - 5:9
**hereunto** [1] - 68:17
**Herman** [3] - 40:10,
48:18, 57:22
**hi** [1] - 54:17
**Hickey** [2] - 31:21,
32:1
**hickey** [1] - 32:7
**High** [1] - 52:20
**high** [3] - 11:2, 52:18,
52:20
**higher** [2] - 50:7, 53:1
**Hills** [1] - 5:21
**hoffman** [1] - 40:10
**HOFFMAN** [1] - 1:3
**Hoffman** [3] - 4:7,
48:18, 57:22
**hold** [7] - 26:8, 26:15,
26:23, 27:5, 28:6,
28:23, 29:16
**Hollow** [1] - 5:21
**home** [4] - 11:8, 11:9,
37:6, 38:14
**hours** [4] - 34:16,
34:24
**huckabee** [1] - 10:2

### I

**iCAC** [1] - 18:11
**ICAC** [1] - 18:11
**idea** [3] - 16:17, 16:22,
30:25
**Ideastream** [3] -
32:18, 32:21, 55:23
**identification** [8] -
12:19, 24:21, 40:21,
47:24, 53:19, 56:19,
61:7, 62:18
**identified** [6] - 14:15,
15:7, 48:16, 64:18,
65:8, 65:17
**identify** [3] - 4:16,
12:22, 40:25

**ignoring** [1] - 54:18
**impair** [1] - 7:2
**important** [2] - 19:13, 20:12
**imposition** [1] - 41:21
**IN** [2] - 1:1, 68:17
**inactive** [1] - 54:11
**includes** [1] - 44:5
**including** [2] - 41:20, 59:20
**INDEX** [1] - 3:4
**indicated** [4] - 24:12, 31:9, 46:6, 55:23
**indicating** [2] - 24:8, 25:16
**individual** [1] - 51:24
**individuals** [4] - 39:16, 39:17, 39:23, 42:16
**information** [9] - 7:13, 9:23, 9:24, 18:5, 48:23, 48:25, 49:13, 51:1, 51:7
**ingested** [1] - 7:1
**inquiring** [2] - 26:14, 26:16
**instructs** [2] - 11:23, 12:4
**intend** [1] - 29:18
**intended** [1] - 27:17
**intent** [5] - 27:21, 28:8, 28:10, 28:12, 28:22
**interested** [1] - 68:14
**interesting** [1] - 9:2
**internally** [2] - 9:25, 18:21
**Internet** [1] - 18:11
**interview** [7] - 21:14, 22:20, 22:21, 27:12, 29:7, 29:12, 29:20
**interviews** [1] - 59:13
**investi** [1] - 33:21
**investigate** [2] - 33:11, 33:15
**investigated** [2] - 33:14, 35:11
**investigation** [11] - 33:4, 34:2, 34:3, 34:8, 34:10, 35:7, 45:23, 46:7, 47:1, 47:2, 47:14
**invited** [2] - 21:13, 22:19
**involved** [2] - 31:4, 34:9
**involvement** [1] - 16:1
**issue** [5] - 16:6, 16:8, 22:10, 35:23, 63:6
**issued** [6] - 13:11,

50:21, 50:22, 51:25, 55:22, 60:2
**issues** [2] - 58:12, 61:1
**items** [1] - 48:4

## J

**January** [5] - 6:1, 6:4, 18:3, 18:22, 31:8
**Jeffrey** [1] - 7:23
**Jennifer** [2] - 2:12, 36:8
**JK** [3] - 1:19, 4:12, 4:14
**Joanna** [2] - 2:12, 36:8
**Joanna's** [1] - 36:9
**job** [4] - 9:7, 10:19, 20:4, 20:10
**jobs** [2] - 11:6, 20:14
**John** [2] - 52:21, 52:24
**JUDGE** [1] - 1:5
**June** [2] - 1:15, 4:3
**justice** [1] - 14:14
**juvenile** [3] - 14:14, 48:13, 54:8
**juvie** [3] - 19:15, 19:16, 19:19
**Juvie** [1] - 19:25

## K

**Katherine** [4] - 32:2, 32:8, 32:9
**Kathleen** [1] - 17:24
**Kathy** [2] - 59:12
**kind** [4] - 36:2, 53:7, 53:11, 64:14
**knowledgeable** [2] - 19:22, 19:23
**knows** [1] - 16:4
**Kristin** [5] - 32:3, 32:4, 32:10, 32:11, 32:12

## L

**Lambert** [2] - 2:6, 4:21
**LAMBERT** [33] - 4:21, 7:24, 12:7, 13:13, 15:10, 20:19, 21:6, 25:7, 29:24, 30:14, 32:3, 32:10, 33:5, 33:7, 36:9, 41:23, 42:2, 42:24, 49:16, 52:4, 58:15, 61:14, 63:3, 63:5, 63:12,

63:18, 63:24, 64:6, 64:10, 64:20, 65:1, 65:4, 66:2
**large** [1] - 20:12
**last** [4] - 18:15, 42:9, 57:10, 62:20
**Laura** [8] - 4:7, 42:21, 43:3, 43:13, 44:1, 44:13, 48:18, 49:9
**LAURA** [1] - 1:3
**law** [1] - 9:7
**Law** [1] - 2:3
**lawful** [1] - 5:6
**lawsuit** [3] - 5:14, 13:8, 14:16
**lead** [1] - 14:21
**learned** [1] - 23:16
**least** [1] - 24:2
**led** [5] - 14:14, 17:19, 33:24, 37:15, 53:13
**left** [3] - 6:13, 8:13, 10:13
**Linda** [7] - 42:21, 43:3, 43:13, 44:1, 44:13, 48:18, 49:9
**LINE** [1] - 67:8
**Lisa** [1] - 36:12
**LLC** [1] - 2:3
**located** [1] - 4:4
**look** [7] - 9:18, 13:4, 13:7, 24:23, 56:25, 63:1, 64:11
**looked** [2] - 13:16, 33:21
**looking** [2] - 41:9, 41:14
**looks** [2] - 61:11, 62:22

## M

**Madison** [1] - 11:5
**Maggie** [1] - 36:15
**mail** [19] - 22:6, 24:12, 24:13, 24:24, 25:16, 32:22, 46:18, 47:9, 48:7, 49:22, 51:12, 54:8, 55:11, 56:3, 56:7, 56:23, 57:10, 57:11, 57:18
**mailed** [1] - 24:7
**mails** [9] - 22:6, 22:8, 45:5, 47:3, 47:5, 50:16, 54:1, 54:4, 60:5
**main** [1] - 17:11
**man** [1] - 57:19
**March** [9] - 18:23, 54:7, 57:5, 57:6,

57:10, 57:11, 57:12, 59:11, 68:22
**Margareten** [4] - 1:11, 4:14, 68:6, 68:20
**Mark** [3] - 31:11, 61:19, 62:14
**marked** [13] - 12:18, 12:21, 24:20, 40:20, 40:23, 47:23, 48:1, 53:18, 53:21, 56:18, 61:6, 61:9, 62:17
**Mason** [4] - 6:16, 7:10, 7:18, 10:20
**Massillon** [1] - 52:20
**master's** [1] - 53:3
**material** [1] - 64:3
**matter** [3] - 15:18, 15:21, 22:13
**matters** [1] - 26:17
**mayor's** [1] - 8:22
**mean** [18] - 15:25, 18:18, 20:5, 20:6, 20:8, 22:2, 27:9, 27:22, 32:20, 34:4, 36:23, 38:2, 44:7, 47:19, 50:1, 50:3, 51:10, 57:9
**meaning** [1] - 30:7
**means** [2] - 20:7, 68:10
**media** [33] - 14:8, 14:12, 14:17, 16:6, 16:7, 16:11, 16:17, 16:23, 17:2, 17:3, 17:15, 17:18, 18:20, 19:3, 19:10, 19:13, 22:9, 26:19, 27:11, 28:15, 29:12, 30:12, 36:5, 40:13, 50:22, 53:7, 55:10, 58:12, 59:6, 59:8, 59:25, 61:2
**meeting** [23] - 23:1, 25:23, 35:15, 35:16, 35:17, 35:18, 35:19, 35:20, 35:21, 35:22, 35:23, 36:1, 36:7, 36:18, 39:24, 40:8, 40:12, 42:14, 42:17, 43:12, 44:24, 49:14
**Megan** [2] - 31:21, 32:1
**members** [2] - 14:7, 14:12
**memory** [4] - 13:16, 46:1, 46:2, 46:9
**Merriam** [1] - 20:17
**met** [1] - 35:12
**meticulous** [2] - 20:18, 20:22

**Meyer** [1] - 62:22
**Michael** [2] - 2:13, 4:8
**MICHAEL** [1] - 1:6
**Miday** [5] - 4:6, 5:17, 25:5, 28:2, 67:23
**MIDAY** [5] - 1:10, 3:2, 5:6, 5:11, 67:3
**might** [1] - 16:23
**Mike** [4] - 54:17, 56:3, 56:6, 59:13
**mind** [1] - 20:9
**minute** [2] - 25:8, 52:3
**minutes** [1] - 34:16
**mishandled** [10] - 17:15, 19:1, 23:5, 35:6, 39:20, 40:11, 42:22, 43:4, 43:14
**mishandling** [1] - 14:13
**missing** [1] - 36:14
**misstates** [1] - 33:7
**Monday** [7] - 26:9, 27:13, 28:7, 29:3, 29:8, 29:17, 29:20
**morning** [3] - 5:13, 26:6, 28:5
**mouth** [2] - 27:24, 28:1
**move** [4] - 11:7, 11:9, 11:10, 11:14
**MR** [54] - 3:3, 4:17, 4:21, 5:12, 7:24, 12:7, 13:4, 13:7, 13:13, 15:10, 15:12, 20:19, 21:6, 21:8, 25:7, 29:24, 30:1, 30:14, 32:3, 32:10, 33:5, 33:7, 36:9, 41:23, 41:25, 42:2, 42:24, 49:16, 52:2, 52:4, 52:5, 58:15, 58:16, 61:14, 63:3, 63:5, 63:9, 63:12, 63:16, 63:18, 63:21, 63:24, 64:2, 64:6, 64:9, 64:10, 64:20, 64:22, 65:1, 65:3, 65:4, 65:20, 65:23, 66:2
**MS** [5] - 4:19, 5:1, 63:11, 63:14, 64:14
**Mussman** [3] - 2:13, 23:2, 36:16
**Myer** [1] - 65:16

## N

**name** [6] - 4:12, 5:13, 5:15, 8:2, 10:6,

36:10
**named** [1] - 68:8
**names** [2] - 7:25, 39:23
**nature** [1] - 45:22
**need** [1] - 54:12
**needing** [1] - 48:16
**neglect** [1] - 58:9
**never** [9] - 30:23, 30:24, 31:1, 41:21, 54:20, 59:17, 63:10, 64:8, 64:18
**New** [8] - 7:17, 7:20, 7:21, 8:7, 8:15, 8:16, 8:17, 10:23
**News** [1] - 31:21
**news** [5] - 14:12, 14:15, 14:21, 16:6, 16:11
**newspaper** [1] - 19:2
**next** [3] - 10:18, 57:24
**NO** [1] - 1:5
**none** [1] - 54:11
**Nora** [3] - 2:7, 5:1, 5:2
**northern** [1] - 4:10
**NORTHERN** [1] - 1:2
**Notary** [3] - 1:12, 68:6, 68:20
**note** [1] - 64:21
**notes** [1] - 41:11
**nothing** [3] - 38:14, 38:15, 68:9
**notice** [3] - 1:16, 13:9, 68:13
**notifying** [1] - 37:16
**number** [16] - 4:8, 14:5, 14:6, 15:8, 18:25, 19:10, 45:5, 47:9, 48:15, 49:1, 57:2, 62:10, 62:11, 65:13, 65:17, 65:19
**numbers** [1] - 57:20
**NYU** [1] - 8:21

## O

**O'MALLEY** [1] - 1:6
**O'Malley** [16] - 2:13, 4:8, 6:2, 6:4, 16:14, 16:25, 23:2, 36:8, 36:12, 42:9, 43:22, 56:4, 56:9, 58:19, 59:4, 59:7
**O'Malley's** [1] - 58:9
**oaths** [1] - 68:7
**object** [3] - 11:25, 20:20, 63:25
**objection** [6] - 21:6, 33:5, 42:24, 49:16,

64:13, 64:21
**objects** [1] - 12:3
**obligation** [1] - 64:3
**obviously** [2] - 37:9, 43:11
**occasions** [1] - 47:9
**OF** [3] - 1:2, 5:11, 67:2
**offended** [1] - 37:5
**offense** [1] - 48:15
**Office** [1] - 2:7
**office** [62] - 1:13, 4:4, 5:23, 6:8, 6:17, 6:19, 6:22, 8:22, 9:23, 10:3, 10:10, 12:15, 13:11, 14:10, 16:4, 17:2, 17:4, 18:9, 18:10, 18:21, 18:25, 20:12, 21:14, 21:15, 21:19, 22:13, 22:19, 22:24, 23:3, 25:23, 30:3, 30:8, 30:13, 31:10, 32:1, 32:17, 33:15, 33:21, 34:1, 34:11, 34:25, 35:11, 35:12, 39:7, 40:9, 48:16, 48:23, 49:7, 49:12, 53:11, 54:19, 55:2, 55:15, 55:19, 58:7, 58:11, 60:25, 62:3, 62:11, 64:4, 65:7, 68:17
**office's** [3] - 14:11, 54:25, 59:3
**officer** [2] - 7:13, 18:5
**official** [1] - 53:14
**OHIO** [2] - 1:2, 1:20
**Ohio** [15] - 1:12, 1:14, 2:4, 2:8, 4:5, 4:10, 10:25, 11:1, 11:15, 24:1, 68:3, 68:6, 68:17, 68:20, 68:21
**OMB** [1] - 8:22
**on-the-record** [1] - 54:12
**once** [1] - 18:25
**onces** [1] - 59:20
**one** [22] - 15:8, 17:1, 17:8, 21:3, 25:8, 29:13, 36:14, 37:4, 37:5, 38:16, 38:17, 48:15, 48:21, 49:1, 54:8, 55:8, 55:15, 58:10, 60:5, 61:25, 63:14, 64:23
**one's** [1] - 21:2
**Ontario** [1] - 1:14, 2:8
**opinion** [3] - 20:20, 21:7, 21:9
**opinions** [1] - 20:13
**optimistic** [1] - 52:6

**otherwise** [1] - 51:6
**outlet** [1] - 27:11
**outlets** [3] - 26:20, 29:12, 30:12
**outside** [1] - 64:15

## P

**p.m** [2] - 58:4, 59:11
**PAGE** [1] - 67:8
**page** [9] - 41:7, 41:24, 41:25, 42:8, 57:24, 62:7, 63:1, 64:25, 65:6
**pages** [3] - 61:11, 61:12, 61:17
**paragraph** [2] - 25:5, 64:16
**paragraphs** [1] - 41:18
**part** [2] - 18:9, 18:10
**particular** [3] - 17:18, 19:15, 37:4
**parties** [1] - 68:14
**path** [2] - 50:19, 59:22
**Pattakos** [4] - 2:2, 2:3, 4:17, 5:13
**PATTAKOS** [19] - 3:3, 4:17, 5:12, 15:12, 21:8, 30:1, 41:25, 52:2, 52:5, 58:16, 63:9, 63:16, 63:21, 64:2, 64:9, 64:22, 65:3, 65:20, 65:23
**Peggy** [2] - 31:5, 32:5
**people** [1] - 36:4
**per** [3] - 40:4, 50:6, 51:2
**performed** [2] - 34:8, 58:12
**Perry** [1] - 52:20
**person** [1] - 36:14
**personal** [1] - 16:1
**personnel** [3] - 51:3, 58:11, 61:1
**pertaining** [1] - 39:10
**Pete** [5] - 27:13, 27:24, 35:20, 42:18, 49:22
**peter** [1] - 4:17
**Peter** [4] - 2:2, 4:12, 5:13, 63:6
**phone** [3] - 24:11, 25:18
**place** [5] - 10:20, 11:7, 11:15, 40:9, 68:12
**Plain** [2] - 13:1, 23:18
**plain** [1] - 23:25
**Plaintiff** [1] - 1:4
**plaintiff** [1] - 4:6

**Plaintiff's** [16] - 3:5, 3:6, 3:6, 3:7, 3:7, 3:8, 3:8, 3:9, 12:18, 24:20, 40:20, 47:23, 53:18, 56:18, 61:6, 62:17
**Plaintiffs** [3] - 1:17, 2:5, 5:7
**plaintiffs** [3] - 4:18, 4:20, 5:14
**point** [5] - 31:8, 43:9, 48:21, 52:1, 58:14
**points** [1] - 13:23
**policy** [3] - 5:24, 58:11, 60:25
**Poore** [3] - 2:7, 5:1, 5:2
**POORE** [6] - 5:1, 13:4, 13:7, 63:11, 63:14, 64:14
**position** [6] - 5:22, 5:25, 7:14, 7:16, 10:8, 18:4
**preparation** [1] - 43:11
**prepare** [2] - 21:23, 22:4
**PRESENT** [1] - 2:11
**present** [2] - 4:15, 36:2
**Press** [1] - 31:12
**press** [4] - 7:19, 35:1, 53:5, 61:20
**pretty** [3] - 30:24, 40:6
**proactively** [1] - 19:14
**Procedure** [1] - 5:8
**produce** [1] - 63:3
**produced** [4] - 63:8, 63:19, 63:22, 64:8
**projects** [1] - 9:4
**proper** [1] - 37:25
**properly** [14] - 17:21, 33:19, 33:25, 36:6, 36:20, 36:25, 37:17, 37:19, 37:22, 38:5, 38:8, 38:24, 39:6, 40:18
**Prosecutor's** [2] - 1:13, 2:7
**prosecuted** [2] - 37:24, 38:11
**prosecuting** [1] - 5:2
**Prosecutor** [3] - 7:18, 16:25, 36:8
**prosecutor** [5] - 4:22, 6:21, 36:12, 38:22, 58:9
**prosecutor's** [11] - 4:4, 5:22, 6:7, 6:17, 14:10, 21:14, 35:12,

40:9, 54:19, 58:7, 65:7
**prosecutors** [12] - 9:25, 38:19, 39:1, 39:5, 41:19, 42:10, 42:25, 43:22, 43:24, 44:16, 49:3, 54:9
**provide** [2] - 48:23, 49:13
**provided** [4] - 5:8, 40:2, 50:4, 56:2
**providing** [1] - 50:25
**psychology** [2] - 53:1
**Public** [4] - 1:12, 68:6, 68:20, 68:21
**public** [9] - 7:13, 9:23, 9:24, 10:10, 18:5, 20:12, 40:4, 50:6, 51:2
**PUBLIC** [1] - 1:19
**published** [15] - 30:20, 30:21, 41:2, 41:4, 45:1, 46:14, 48:24, 50:14, 51:13, 57:15, 60:9, 60:22, 62:23, 63:17, 65:11
**publishing** [1] - 49:14
**Puello** [4] - 7:22, 8:3, 8:5, 53:9
**PUELLO** [1] - 8:5
**pull** [1] - 20:17
**pulled** [1] - 36:4
**purpose** [1] - 5:7
**purposes** [8] - 12:19, 24:21, 40:21, 47:24, 53:19, 56:19, 61:7, 62:18
**pursuant** [3] - 1:15, 14:1, 68:12
**putting** [3] - 27:22, 27:24, 28:1

## Q

**Quail** [1] - 5:21
**qualifications** [2] - 7:16, 15:20
**qualified** [2] - 15:17, 15:21
**questions** [20] - 11:22, 12:1, 45:7, 45:12, 45:19, 46:19, 46:23, 47:6, 47:10, 48:13, 49:20, 50:11, 50:15, 50:16, 51:22, 55:8, 59:20, 60:23, 63:23, 65:24
**quick** [1] - 65:4

# R

**Rachel** [28] - 2:2, 4:19, 19:7, 19:16, 20:22, 21:3, 21:13, 22:12, 22:19, 23:1, 23:6, 23:9, 23:15, 23:23, 24:4, 24:14, 25:6, 25:11, 25:16, 28:3, 28:11, 28:12, 28:19, 30:10, 32:6, 35:17, 35:19, 35:21
**raise** [1] - 63:5
**raising** [1] - 64:12
**ran** [1] - 31:19
**rape** [2] - 17:7, 37:15
**rapes** [1] - 41:20
**re** [2] - 37:5, 60:6
**re-offended** [1] - 37:5
**reach** [1] - 30:7
**reached** [2] - 31:5, 31:7
**read** [13] - 13:13, 13:14, 25:8, 39:12, 54:20, 58:17, 58:18, 61:14, 61:23, 63:3, 65:2, 66:2, 67:4
**reading** [11] - 14:19, 14:20, 42:3, 42:4, 42:11, 42:12, 50:18, 54:15, 54:16, 59:15, 59:16
**ready** [1] - 65:5
**real** [1] - 65:4
**really** [3] - 8:18, 8:23, 64:23
**REASON** [1] - 67:8
**reason** [2] - 7:5, 26:24
**reasons** [4] - 14:16, 16:6, 19:10, 27:16
**received** [5] - 25:15, 48:7, 52:19, 54:4, 57:18
**recess** [1] - 52:11
**recognize** [5] - 12:25, 53:23, 61:13, 61:15, 62:21
**recommend** [1] - 56:14
**recommendation** [6] - 16:12, 16:19, 16:20, 16:25, 19:7, 19:9
**recommended** [1] - 58:23
**record** [10] - 4:2, 4:16, 5:16, 12:23, 29:25, 52:9, 52:14, 54:12, 66:1, 68:11
**records** [4] - 39:10,

40:4, 50:6, 51:3
**reduced** [1] - 68:10
**refer** [7] - 45:13, 45:16, 45:24, 46:3, 46:4, 46:22, 47:21
**referenced** [1] - 59:21
**referred** [2] - 37:24, 38:11
**referring** [8] - 24:18, 35:18, 35:20, 46:10, 46:12, 46:13, 56:4, 56:22
**refresh** [1] - 13:16
**relation** [1] - 60:4
**relative** [2] - 68:13, 68:14
**remember** [25] - 17:12, 22:12, 35:15, 35:19, 36:21, 37:1, 37:7, 38:1, 38:18, 38:25, 45:3, 45:6, 45:8, 45:10, 45:15, 45:18, 45:19, 45:25, 46:5, 46:15, 47:7, 47:11, 47:18, 47:20, 48:2
**rephrase** [1] - 12:12
**report** [2] - 22:16, 42:6
**reported** [10] - 18:6, 19:2, 19:19, 25:24, 42:1, 42:10, 62:12, 62:14, 65:16, 65:18
**reporter** [1] - 4:13, 4:25, 5:5, 19:14, 19:21, 20:23, 20:24, 21:12, 23:19, 32:16, 40:7
**REPORTER** [1] - 8:1
**reporters** [8] - 20:13, 30:2, 33:1, 33:3, 33:10, 33:12, 33:16, 34:13
**REPORTING** [1] - 1:19
**Reporting** [1] - 4:13
**reporting** [6] - 4:14, 21:16, 23:15, 23:21, 23:22, 68:15
**reports** [1] - 41:20
**represent** [1] - 5:14
**reputation** [1] - 60:18
**reputations** [1] - 60:8
**request** [5] - 39:9, 40:4, 50:6, 51:3, 51:7
**requested** [1] - 39:9
**rescheduled** [1] - 29:1
**resign** [5] - 42:11, 43:23, 48:18, 54:14, 58:14
**resignations** [1] -

59:14
**resigned** [1] - 54:9
**respect** [2] - 20:9, 39:4
**respond** [4] - 54:17, 55:11, 55:17, 55:19
**responded** [1] - 60:2
**responding** [5] - 26:8, 27:5, 28:6, 28:23, 29:17
**responds** [1] - 59:12
**response** [12] - 54:13, 54:23, 54:25, 55:2, 56:6, 56:23, 57:24, 58:19, 58:21, 59:17, 60:3
**responsibile** [1] - 38:20
**responsibilities** [5] - 9:20, 18:16, 18:18, 18:19, 18:22
**responsibility** [1] - 24:6
**responsive** [2] - 29:10, 29:11
**restate** [3] - 17:17, 37:13, 43:2
**restoration** [1] - 60:18
**restore** [1] - 60:7
**resume** [1] - 15:24
**review** [5] - 9:3, 21:23, 22:1, 22:4, 48:16
**reviewed** [4] - 38:10, 41:22, 51:4, 54:10
**road** [1] - 49:22
**Road** [1] - 2:3
**robin** [1] - 36:3
**Robin** [1] - 44:5
**role** [2] - 17:22, 40:16
**rolling** [1] - 17:9
**round** [1] - 36:3
**Rule** [1] - 68:16
**Rules** [1] - 5:8
**run** [1] - 10:15
**runs** [1] - 57:8
**Russ** [1] - 36:13
**Russell** [1] - 36:13
**Ryan** [8] - 4:6, 5:17, 25:5, 26:5, 28:2, 54:7, 54:20, 67:23
**RYAN** [5] - 1:10, 3:2, 5:5, 5:11, 67:3

# S

**sanders** [1] - 10:2
**Sarah** [2] - 10:2, 10:7
**schedules** [1] - 27:2
**scheduling** [5] - 27:1,

27:8, 27:9, 27:14
**School** [1] - 52:21
**school** [5] - 9:7, 11:2, 52:18, 52:20, 52:22
**scope** [1] - 64:15
**seal** [1] - 68:17
**second** [7] - 25:8, 41:7, 62:7, 63:1, 64:25, 65:2, 65:6
**secretary** [1] - 7:19
**see** [3] - 8:13, 43:19, 61:19
**seek** [1] - 59:7
**sense** [1] - 18:19
**sent** [9] - 13:1, 47:3, 50:15, 54:4, 55:6, 55:7, 57:10, 57:11, 57:12
**series** [10] - 45:7, 45:12, 45:19, 46:19, 47:3, 47:10, 49:19, 55:7, 59:20, 60:23
**set** [2] - 68:9, 68:17
**seven** [12] - 39:11, 39:15, 39:16, 42:22, 43:4, 43:6, 43:14, 44:2, 44:14, 49:5, 54:18, 60:16
**Seven** [1] - 5:21
**several** [1] - 55:7
**sex** [7] - 17:6, 48:15, 54:10, 57:3, 57:20, 65:8
**sexual** [8] - 14:13, 17:15, 19:1, 23:7, 37:6, 41:21, 54:18, 58:10
**Shaffer** [10] - 23:19, 24:13, 24:17, 24:24, 27:4, 35:13, 36:18, 37:8, 39:7, 62:12
**Shaffer's** [1] - 24:6
**shared** [1] - 18:18
**short** [5] - 49:21, 50:22, 51:25, 55:22, 60:3
**shows** [1] - 57:24
**SIGNATURE** [1] - 67:2
**similar** [4] - 7:17, 10:23, 18:18, 55:9
**sit** [1] - 28:5
**situation** [2] - 26:6, 28:5
**six** [1] - 41:18
**skim** [1] - 13:13
**social** [1] - 38:12
**sociology** [1] - 52:25
**someone** [1] - 32:21
**sorry** [7] - 5:1, 14:6, 24:4, 32:7, 33:9,

38:7, 65:2
**sort** [2] - 10:2, 17:19
**specific** [5] - 22:2, 38:22, 45:9, 55:4, 55:13, 64:23
**specifically** [10] - 11:7, 11:23, 12:4, 12:14, 13:20, 22:18, 36:21, 43:12, 49:8, 50:20
**specifics** [1] - 37:1
**Spectator** [1] - 53:7
**speculate** [1] - 20:9
**spell** [2] - 8:4, 32:14
**spent** [3] - 34:11, 34:19, 34:23
**spokesman** [1] - 10:10
**SQUARE** [1] - 1:19
**Square** [1] - 68:21
**SS** [1] - 68:3
**staff** [1] - 10:1
**started** [5] - 17:17, 19:3, 26:6, 28:4, 53:6
**starting** [3] - 19:11, 33:22, 37:14
**state** [9] - 5:15, 7:23, 20:9, 28:1, 38:23, 51:20, 53:14, 56:24
**State** [1] - 1:12, 68:3, 68:6, 68:20
**statement** [10] - 15:5, 16:9, 49:6, 49:21, 50:22, 51:25, 55:22, 56:22, 58:6, 60:24
**statements** [2] - 59:3, 64:17
**States** [1] - 4:9
**STATES** [1] - 1:1
**station** [10] - 26:5, 26:14, 26:16, 26:24, 27:1, 27:5, 28:4, 28:24, 29:17, 31:4
**stations** [2] - 30:22, 50:23
**stenotypy** [1] - 68:10
**still** [1] - 63:22
**stipulate** [1] - 15:10
**stipulations** [2] - 1:16, 68:13
**stop** [1] - 18:13
**story** [46] - 21:16, 21:20, 22:16, 22:18, 22:22, 23:15, 24:5, 24:15, 25:6, 25:11, 25:17, 25:24, 26:2, 26:20, 27:18, 28:3, 28:9, 28:25, 29:16, 29:18, 30:3, 31:19,

33:11, 33:16, 36:24, 37:21, 38:22, 38:23, 39:5, 39:8, 39:21, 41:2, 41:4, 41:8, 47:4, 48:14, 48:22, 49:2, 49:14, 50:14, 51:13, 57:8, 57:15, 60:22, 61:19
**Street** [2] - 1:14, 2:8
**subject** [6] - 14:5, 14:18, 15:7, 15:18, 15:21, 39:20
**subsequent** [2] - 47:3, 50:15
**substances** [1] - 7:1
**subway** [3] - 11:10, 11:11
**suggested** [1] - 17:1
**Suite** [1] - 68:21
**SUITE** [1] - 1:20
**swear** [1] - 5:5
**sworn** [2] - 5:9, 68:8

## T

**Task** [1] - 18:12
**technology** [1] - 68:11
**ten** [2] - 11:10, 65:10
**testified** [2] - 47:13, 62:4
**testify** [11] - 6:24, 7:3, 7:6, 12:14, 14:1, 14:4, 14:10, 15:7, 15:17, 15:20, 68:8
**testifying** [1] - 15:14
**testimony** [6] - 22:14, 22:15, 27:25, 28:18, 67:6, 68:11
**THE** [14] - 1:1, 4:1, 4:24, 5:4, 8:1, 12:5, 13:6, 15:15, 30:16, 36:11, 52:8, 52:13, 65:22, 65:25
**themselves** [2] - 4:16, 37:2
**Thereupon** [9] - 12:18, 24:20, 40:20, 47:23, 52:11, 53:18, 56:18, 61:6, 62:17
**thinking** [1] - 36:14
**third** [2] - 25:4, 42:8
**thirds** [1] - 41:17
**thorough** [1] - 34:1
**thoroughly** [3] - 21:2, 21:5, 35:11
**three** [9] - 15:16, 42:9, 42:25, 43:22, 43:24, 44:3, 44:15, 49:3, 61:11

**timeline** [1] - 51:16
**title** [3] - 7:11, 7:12, 18:5
**titled** [1] - 4:7
**today** [7] - 4:2, 4:13, 6:24, 7:7, 12:14, 21:24, 22:5
**together** [1] - 36:4
**Tom** [3] - 62:22, 65:16, 65:18
**took** [3] - 39:14, 40:9, 51:5
**top** [2] - 15:8, 62:7
**transcribed** [1] - 68:10
**transcription** [1] - 67:6
**trash** [4] - 59:24, 60:7, 60:10
**trashed** [1] - 60:12
**true** [5] - 28:8, 28:22, 54:18, 67:5, 68:11
**truth** [4] - 60:6, 68:9, 68:9
**truthfully** [2] - 7:3, 7:7
**try** [2] - 12:12, 29:13
**trying** [5] - 26:17, 27:2, 27:25, 53:8, 55:25
**turn** [1] - 65:15
**TV** [11] - 26:5, 26:14, 26:16, 26:24, 27:1, 27:5, 28:4, 28:24, 29:17, 30:21, 31:4
**two** [3] - 29:12, 41:17
**Tye** [1] - 36:13

## U

**ultimately** [1] - 16:15
**un-reviewed** [1] - 54:10
**unacceptable** [1] - 58:10
**uncovered** [1] - 41:19
**uncovering** [4] - 17:20, 17:22, 33:18, 37:11
**under** [7] - 7:9, 8:24, 27:20, 42:8, 43:19, 68:11, 68:15
**undergrad** [1] - 8:21
**undersigned** [1] - 67:3
**ungovernable** [1] - 9:17
**unit** [1] - 14:14
**UNITED** [1] - 1:1
**United** [1] - 4:9
**unless** [2] - 11:22,

12:3
**up** [27] - 10:19, 16:22, 20:17, 20:25, 21:16, 23:15, 23:22, 26:1, 27:19, 39:23, 44:23, 45:3, 45:4, 45:11, 45:21, 46:6, 46:18, 47:14, 48:4, 48:13, 50:14, 50:23, 50:25, 52:15, 55:24, 56:22, 59:19
**updated** [3] - 41:8, 41:11, 41:14
**ups** [1] - 55:7

## V

**various** [1] - 27:16
**venture** [1] - 10:18
**verify** [1] - 35:4
**verifying** [1] - 34:12
**version** [2] - 41:9, 41:15
**versus** [1] - 4:8
**via** [2] - 46:18, 47:9
**victim** [3] - 38:14, 38:16
**victims** [1] - 37:23
**video** [1] - 13:9
**VIDEOGRAPHER** [6] - 4:1, 4:24, 5:4, 52:8, 52:13, 65:25
**Videotaped** [1] - 1:10
**Volk** [5] - 32:2, 32:3, 32:4, 32:7, 32:12
**VOLK** [1] - 32:15
**vs** [1] - 1:5

## W

**wants** [2] - 51:23
**Warnousky** [1] - 24:25
**Webster** [1] - 20:17
**week** [1] - 42:9
**WHEREOF** [1] - 68:17
**Whinery** [2] - 2:12, 36:11
**whole** [1] - 68:9
**williamson** [1] - 23:2
**Williamson** [1] - 36:12
**wishes** [1] - 21:3
**wishing** [1] - 21:1
**WITNESS** [7] - 12:5, 13:6, 15:15, 30:16, 36:11, 65:22, 68:17
**witness** [3] - 5:5, 68:8, 68:12
**WKYC** [1] - 62:23

**words** [2] - 27:24, 28:1
**works** [4] - 11:21, 18:8, 18:9, 19:24
**wow** [1] - 8:25
**write** [3] - 23:9, 23:12, 23:23
**writes** [3] - 24:13, 26:4, 44:15, 44:17, 48:12
**writing** [4] - 24:2, 24:3, 53:6, 68:10
**written** [1] - 61:19
**wrote** [4] - 44:22, 47:4, 49:2, 60:9
**WWW.JARKUB. COM** [1] - 1:22

## Y

**year** [3] - 8:8, 8:12, 18:15
**years** [2] - 11:10, 19:19
**yes"** [2] - 10:16, 15:9
**York** [8] - 7:17, 7:20, 7:21, 8:7, 8:15, 8:16, 8:17, 10:24

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| LAURA HOFFMAN, et al., | Case No.: 1:18-CV-00309 |
| Plaintiffs, | Judge Christopher A. Boyko |
| v. | **Plaintiffs' Notice of Video Depositions of (1)** |
| MICHAEL O'MALLEY, et al., | **Defendant Michael O'Malley, and (2)** |
| Defendants. | **Representatives of Defendant Cuyahoga County pursuant to Fed.R.Civ.P. 30(B)(6)** |

Please take notice that, pursuant to Rule 30(B)(6) of the Federal Rules of Civil Procedure, Plaintiffs Laura Hoffman and Linda Herman will take the deposition upon oral examination, **on May 23 and 24, 2019**, of Defendant Cuyahoga County by and through one or more officers, directors, managing agents, or other persons who are designated to testify on its behalf with respect to following topics:

1. The reasons for the County's respective decisions to advise Plaintiff Laura Hoffman, Plaintiff Linda Herman, and Robin Belcher, in February 2017, that each of these persons could resign from her employment with the Cuyahoga County Prosecutor's Office ("CCPO") or face termination of that employment, and the facts supporting those reasons. *See* Responses and Objections to Plaintiffs' Amended Second Set of Interrogatories to Defendant Cuyahoga County, Nos. 1, 2, and 5.

2. The reasons for the County's respective decisions to discipline Chad Cleveland, Kristen Hatcher, Lakesha Johnson, and Ralph Kolasinski for allegedly mishandling sexual-assault cases in the juvenile justice unit in 2017, as identified in the County's Responses and Objections to Plaintiffs' Third Set of Interrogatories, No. 8, and the facts supporting those reasons.

3. The reasons for the County's respective decisions to allow Chad Cleveland, Kristen Hatcher, Lakesha Johnson, and Ralph Kolasinski to remain employed by the CCPO, as stated in the County's Responses and Objections to Plaintiffs' Third Set of Interrogatories, No. 8.

4. The County's communications with members of the news media about the alleged mishandling of sexual-assault cases in the juvenile justice unit in 2017, which led to the allegedly defamatory news coverage as identified in the Complaint in this lawsuit, and the reasons why the County communicated with the media about this subject.

PLAINTIFF'S EXHIBIT
1
PENGAD 800-631-6989

5.  The County's negotiations with Laura Hoffman over reasonable accommodations for her disability.

Additionally, **on June 12, 2019**, Plaintiffs will, pursuant to Fed.R.Civ.P. 30, take the deposition upon oral examination of Defendant Michael O'Malley.

The depositions shall begin on the above-noticed dates at 9:00 AM at The Pattakos Law Firm LLC, 101 Ghent Road, Fairlawn, OH 44333, continue from day-to-day until completed, be recorded by video and stenographic means, and occur before a qualified Notary Public. This notice is being issued prior to a scheduling conference with opposing counsel for good cause, being that the witnesses to testify for the County need to be identified in accordance with the above in order for the schedule for these depositions to be finalized.

Respectfully submitted,

*/s/ Peter Pattakos*
Peter Pattakos (0082884)
Rachel Hazelet (0097855)
THE PATTAKOS LAW FIRM LLC
101 Ghent Road
Fairlawn, Ohio 44333
Phone: 330.836.8533
Fax: 330.836.8536
peter@pattakoslaw.com
rhazelet@pattakoslaw.com

### Certificate of Service

My office emailed the foregoing document to counsel for Defendants, Dave Lambert (dlambert@prosecutor.cuyahogacounty.us), Nora Poore (npoore@prosecutor.cuyahogacounty.us) and Brendan Healy (bhealy@prosecutor.cuyahogacounty.us) on March 21, 2019, and filed it on the same date using the Court's e-filing system, which will serve the document on all necessary parties.

*/s/ Peter Pattakos*
*Attorney for Plaintiffs*

**From:** Cory Shaffer <CShaffer@cleveland.com>
**Date:** Friday, February 10, 2017 at 12:44 PM
**To:** Kris Wernowsky <kwernowsky@cleveland.com>
**Subject:** Juvenile rape cases

Hey man.

I know when we talked about the O'Malley thing about the juvenile rape cases, you said Quinn didn't really want to touch it because he thinks it's retribution against Deskins. I was also under the impression that Rachel was still going to do it.

I just wanted to let you know that O'Malley fired three juvenile lawyers this week over this, and the office has identified as many as 1,900 sexual assault cases that never got reviewed by juvenile prosecutors.

Ryan Miday says he didn't think Rachel was following the story anymore. He also told me that a TV station has started asking about the situation this morning. He said if we wanted to do anything on it he would hold off on responding to them until Monday.

Do you want to me chase this, or still stick with Quinn's assertion not to do anything with it?



PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

# Prosecutors uncover dozens of uncharged juvenile cases, including rape

 By **Cory Shaffer, cleveland.com**
**Email the author | Follow on Twitter**
on February 13, 2017 at 9:05 PM, updated February 14, 2017 at 1:11 PM

CLEVELAND, Ohio -- Cuyahoga County Prosecutor Michael O'Malley said his office has uncovered dozens of sexual assault cases in the office's Juvenile Division that sat dormant on the desks of assistant prosecutors for months and, in some cases, years.

Three prosecutors were forced to resign last week after a team of lawyers found more than 70 rape and sexual assault cases dating back to 2014. The prosecutors failed to track the cases, and no charges were filed, O'Malley said.

Some cases included victims as young as 3 years old, suspects who had already confessed their crimes and suspects who later went on to commit more crimes, O'Malley and assistant prosecutors Joanna Whinery, Jennifer Driscoll and Gregory Mussman said Monday in an interview.

Ads by ZINC



PLAINTIFF'S EXHIBIT
3
PENGAD 800-631-6989

Those prosecutors also uncovered more than 1,900 additional cases that assistant prosecutors in the juvenile division may have incorrectly categorized as "inactive" in the office's computer system since 2012. O'Malley, who took office just over a month ago, is now examining new ways to track the cases that get handled in the juvenile division.

"It's horrific," O'Malley said.

The prosecutors said their review of the cases could lead to hundreds of new charges being filed in the coming months.

O'Malley said he does not believe his predecessor, former Cuyahoga County Prosecutor Timothy McGinty, knew about the cases.

"This has nothing to do with the previous administration, other than the fact that you have a Juvenile Chief who apparently failed in his duties as well as somebody who was in charge of that intake unit who failed in their duties," O'Malley said.

McGinty's chief of the juvenile division was Assistant Cuyahoga County Prosecutor Duane Deskins.

Last month, Cleveland Mayor Frank Jackson appointed Deskins to a newly created position in his cabinet, Chief of Prevention, Intervention and Opportunity for Youth and Young Adults.

Deskins told cleveland.com Monday night that he couldn't respond to the way the cases were handled without the details of each case, but said he was not aware of any delays or mishandling of cases while he headed the juvenile division.

He pointed out that there were two levels of supervisors underneath him who would have directly dealt with cases on a daily basis, but stood by the work the office did.

"We did an aggressive job," he said.

**The revelation**

The Cleveland Rape Crisis Center reached out to prosecutors during O'Malley's first week in office for updates on several sexual assault cases involving juveniles.

A victim advocate at the rape crisis center also asked Whinery for an update on approximately 15 cases. Victims had become concerned that their cases had "fallen through the cracks," Whinery said.

When Whinery, Driscoll and Mussman started looking into the cases, they found the assistant prosecutors never fully reviewed them for charges, the lawyers said.

They launched a deeper probe and uncovered more uncharged cases in the juvenile division.

Then on Jan. 26, police in University Heights asked about the October sexual assault of a high school student at Cleveland Heights High School.

An assistant juvenile prosecutor took the case shortly after the crime was reported, but no charges were filed, Mussman said. Once Mussman looked at the case file, his office found probable cause to file charges against four teenagers and took out arrest warrants later that day.

On prosecutors' desks, they found years-old police reports that had never been entered into office database that tracks cases. Other cases, Mussman said, were entered into the database but sat for 18 months with no follow-up.

The prosecutors eventually uncovered 76 cases, including 37 reported rapes and 32 reports of gross-sexual imposition, that were never fully reviewed for charges.

"Police reports and files had been submitted to the office, but there was no charging being done," O'Malley said.

The revelation shocked O'Malley's team. O'Malley was a former assistant prosecutor under Cuyahoga County Prosecutor Bill Mason, whose 10-year tenure included the accumulation of thousands of rape kits that had sat untested in Cleveland's police department. Cleveland police officials first discovered the backlog in late 2009.

The revelation led to widespread reforms. McGinty created a special task force to use DNA evidence to test the kits and clear the backlog. It led to hundreds of convictions and is considered a national model.

**More cases**

But O'Malley cautioned that the 76 sexual assault cases may be just a fraction of the cases that were delayed or brushed off.

The office uses computer software that will send periodic alerts to remind assistant prosecutors if their cases are still active. The software allows prosecutors to change each case from "active" to "inactive," meaning the alerts would stop popping up, O'Malley said.

From 2007 to 2012, there were 13 cases that were switched from active to inactive status, and they were all duplicates of cases that had already been created, O'Malley's office said.

But Driscoll and Mussman found that since 2012, assistant prosecutors in the juvenile division switched more than 1,900 cases to "inactive" in the software.

Driscoll started looking into the cases that had been moved to "inactive" status, and found that, while many were duplicate files, others involved rape, aggravated robbery and felonious assault reports that should have been fully investigated. Some of the reasons prosecutors gave for moving the cases to inactive included that the victim or the victim's parents didn't answer a phone call, Driscoll said.

"It pretty much amounted to a do-nothing list," O'Malley said.

The office is conducting a full audit to determine how many of the 1,900 cases were incorrectly labeled as inactive. Driscoll is working backwards and has identified 20 cases that were incorrectly switched to "inactive" status dating back to May.

O'Malley said he assumes that review will lead to hundreds of new charges being filed in the coming months.

**Discipline**

O'Malley last week asked three assistant prosecutors who handled the bulk of the delayed cases to resign.

Laura Hoffman, Linda Herman and Robin Belcher resigned Wednesday, Thursday and Friday, respectively, after each had a disciplinary hearing in O'Malley's office.

O'Malley disciplined four more lawyers, handing out a combination of suspensions, demotions and reassignments, according to disciplinary records.

Records cite incompetency, inefficiency and neglect of duty as reasons for the reprimands.

O'Malley said his office is still investigating the scope of the problem and he could discipline more employees in the future. But he pledged that no case will ever fall through the cracks under his tenure in office.

"We will never have a situation where we're talking about any case and any victim where this office failed them," O'Malley said.

**Changes**

O'Malley has installed Mussman as the head of the juvenile division, and assigned veteran prosecutor Maggie Kane to the juvenile division to help with the influx of cases.

The office is also going to work with the juvenile court to install a better tracking system for every case that gets brought to their office, whether it's initiated by a police report or a case kicked to them through municipal court.

The office has eliminated the "inactive list," Driscoll said. Cases will remain active until supervisors in the juvenile division decide to either file charges or completely close the case.

"If it takes time, it takes time," she said. "We want to do the right thing."

**'Not about personalities'**

O'Malley was in the running to get the job that Deskins ultimately got when McGinty took office in 2012. McGinty instead assigned

Prosecutors uncover dozens of uncharged juvenile cases, including... http://www.cleveland.com/metro/index.ssf/2016/11/prosecutors_u...

O'Malley to supervise the unit that prosecutes crimes in the southwest side of Cleveland and the surrounding suburbs.

O'Malley said his office's decision to go public with revelations had nothing to do with making McGinty or Deskins look bad.

"This isn't about personalities. This is about results," O'Malley said. "And the results for the public have been a failure in this particular case."

*To comment on this story please visit **Monday's crime and courts comments page**.*

---

Registration on or use of this site constitutes acceptance of our **User Agreement** and **Privacy Policy**

© 2016 Advance Ohio All rights reserved (**About Us**).
The material on this site may not be reproduced, distributed, transmitted, cached or otherwise used, except with the prior written permission of Advance Ohio

**Community Rules** apply to all content you upload or otherwise submit to this site.

▷ **Ad Choices**

2/16/17, 9:08 AM

 Miday, Ryan <rmiday@prosecutor.cuyahogacounty.us>
Hi Cory, Got your email. I will respond  Ryan

Wed 2/15/2017, 11:47 AM

 Cory Shaffer
Wed 2/15/2017 9:46 AM
To:  rmiday@prosecutor.cuyahogacounty.us; kcaffrey@prosecutor.cuyahogacounty.us  ⌃

↑ Reply ⌄



Sent Items

Hey guys.

I have a few follow-up questions for the juvenile division story:

1. How many of the 76 sex-offense cases your office identified as needing review were assigned to each APA who was forced to resign, Laura Hoffman and Linda Herman?
2. What was the hire date of each of those APAs?
3. What was Robin Belcher's role in the office, and when was she first hired?
4. How many of the 76 cases were assigned to the APAs who received discipline? What are their hire dates?
5. What was Mr. Kolasinski's role? Did he know about the cases not getting entered for review, or the inactive list?
6. Can you provide the correspondence from the Rape Crisis Center advocate?
7. How did Prosecutor O'Malley decide who to force to resign and who to seek discipline against?
8. Can you provide a list of case numbers for these cases that sat dormant?

Thanks guys.

-Cory
—
*Cory Shaffer*
*Crime Reporter*
*cleveland.com*
*Cell: 216-316-7045*
*Twitter: @cory_shaffer*


PENGAD 800-631-6989
**PLAINTIFF'S**
**EXHIBIT**
4



**Cory Shaffer**
Fri 3/17/2017 9:41 AM
To:  rmiday@prosecutor.cuyahogacounty.us  ⌄

↩ Reply  | ⌄

Sent Items

Hey Ryan.

I got an email from one of the juvenile prosecutors who resigned that says that both of the APAs combined only had 7 of the  76 un-reviewed sex-crimes cases, and none of the inactive cases.

Is that accurate? If so, I need an on-the-record response from you guys explaining why they were made to resign.

*Cory Shaffer*
*Crime Reporter*
*cleveland.com*
*Cell: 216-316-7045*
*Twitter: @cory_shaffer*

PLAINTIFF'S EXHIBIT
5
PENGAD 800-631-6989



Miday, Ryan <rmiday@prosecutor.cuyahogacounty.us>
Fri 3/17/2017 5:21 PM
To: Cory Shaffer

Inbox

Hi Cory

Mike said:
If her admission is true, ignoring seven sexual assaults against children in the county prosecutor's office will never be acceptable.

Ryan

•••

 **Cory Shaffer**                                              🔖    ↩ Reply | ⌄
Tue 3/21/2017 11:10 AM
To:  Miday, Ryan <rmiday@prosecutor.cuyahogacounty.us>  ⌃

Sent Items

Hey man.

Did you guys get the numbers of the sex-crimes cases that were assigned to Herman and Hoffman yet?

—
*Cory Shaffer*
*Crime Reporter*
*cleveland.com*
*Cell: 216-316-7045*
*Twitter: @cory_shaffer*
•••

PLAINTIFF'S
EXHIBIT
6
PENGAD 800-631-6989



Caffrey, Kathleen <kcaffrey@prosecutor.cuyahogacounty.us>
Tue 3/21/2017, 2:18 PM

Statement from the Cuyahoga County Prosecutor's Office:

It is Prosecutor O'Malley's belief that neglecting even one sexual assault case is unacceptable.
Our office policy is not to discuss personnel issues in the media. The work performed by these employees was clearly deficient
when confronted with that fact, they made a choice to resign.
...

**CS**

**Cory Shaffer**                                                                                                     ↩ Reply
Tue 3/21/2017 3:12 PM
To:  Caffrey, Kathleen <kcaffrey@prosecutor.cuyahogacounty.us>  ⌃

Sent Items

Thanks Kathy.

But I thought Mike said during the first interviews that he asked for their resignations?

*Cory Shaffer*
*Crime Reporter*
*cleveland.com*
*Cell: 216-316-7045*
*Twitter: @cory_shaffer*

AdChoices ▷



Call 440-366-4040  for a
complete season schedule  or visit
**www.stockerartscenter.com**

Stocker Arts Center
of Lorain County Community College

1005 N. Abbe Rd., Elyria, Ohio 44035
Free Parking

# THE MORNING JOURNAL

## Crime

- Weather
- Traffic
- Markets

Search [Go]

- Jobs
- Jobs

Skip to Main Window



782

Like
Share

ter

lit
:rest
omments

Email
Print
Tumblr
LinkedIn
StumbleUpon

News
- Lorain County
- Cuyahoga County
- Ohio
- Crime
- Nation & World
- Weather
- Lottery
- Traffic
- Opinion

- Sports
- High School Sports
- Ohio State
- Cavaliers
- NFL
- MLB
- NBA

- Business
- Entertainment
- Movie Listings
- TV Listings

- Lifestyle
- Celebrations
- Neighborhood News
- Lottery Results
- Horoscopes

- Obituaries
- Browns
- Indians
- Marketplace
- Jobs
- Weekly Ads
- Classifieds
- Net Me a Job

- Tools
- Contact Us
- Advertise With Us
- Submit Announcements
- Work for Us
- Contests
- Subscribe



PLAINTIFF'S
EXHIBIT
4

PENGAD 800-631-6989

Case: 1:18-cv-00309-CAB   Doc #: 40-6   Filed: 09/09/19   90 of 100.   PageID #: 1918

- o Manage Your Subscription
- o Newsletter Sign up
- o E-Paper
- o Mobile
- o Email Newsletter Sign up
- o Manage Email Newsletters
- o RSS
- o Newspapers in Education
- o Gasbuddy

- Home â†'
- Crime

# Cuyahoga County prosecutor: Dozens of child sex assault cases were 'ignored'



In this file photo, Michael O'Malley speaks at a community forum at the Harvard Community Services Center in Cleveland. Cuyahoga County prosecutor O'Malley said Tuesday that more sexual assault cases are expected to be found as his office continues to review more than 1,900 cases categorized as inactive since 2012. O'Malley said Tuesday it's likely that hundreds of criminal charges from the cases prosecutors failed to enter into the Juvenile Court's tracking database and determine whether charges were warranted. Tony Dejak — The Associated Press file

By Mark Gillispie, The Associated Press

Posted: 02/14/17, 3:32 PM EST | Updated: on 02/14/2017

18 Comments

CLEVELAND >> Assistant prosecutors in Cleveland "ignored" about 70 rape and sexual assault cases involving juvenile suspects and victims and failed to determine if criminal charges should be filed, the new Cuyahoga County prosecutor said Tuesday.

Prosecutor Michael O'Malley said additional sexual assault complaints involving juveniles are expected to be found in the coming weeks as his office continues reviewing more than 1,900 cases marked inactive in a computer system used by prosecutors.

"There was a conscious decision (by prosecutors) to make some of these cases inactive," O'Malley said. "It's outrageous."

The problem was first reported Monday by Cleveland.com.



**EDTOMKO**

Jeep  DODGE RAM

**LORAIN**
440-933-3500

**CLEVELAND**
440-835-5900

HOURS: MONDAY, THURSDAY, 8-8 • TUESDAY, WEDNESDAY,
FRIDAY, 8-6 • SATURDAY 8-4 • SUNDAY CLOSED

www.edtomkochryslerjeepdodge.com
33725 WALKER RD., AVON LAKE, OHIO

Charges have been filed in about a dozen of the 70 cases thus far, O'Malley said, adding that some may not result in charges while others will be sent back to police for further investigation. The review of the inactive cases could result in hundreds of new charges being filed, he said.

The prosecutor's office was first alerted to the problem during O'Malley's first week in office by an advocate from the Cleveland Rape Crisis Center acting on behalf of victims' families who asked for an update about some of the cases that had been ignored.

The review has consumed the prosecutor's office during O'Malley's first six weeks in office. "We're peeling the layers of an onion," he said. "And every day there are more revelations."

Some of the victims in the 70 cases were as young as 3 years old. And some of the cases, which date back three years, would have been easy to prosecute because suspects confessed, O'Malley said.

Three assistant county prosecutors have been forced to resign and four others have been disciplined. O'Malley said he plans to refer prosecutors' names to the Ohio Supreme Court's disciplinary counsel.

It's not clear why prosecutors failed to act on the cases or to enter them into the office's case-management system. O'Malley said he finds it "hard to believe" that his predecessor, Tim McGinty, would have allowed prosecutors to ignore cases. O'Malley defeated McGinty in last year's Democratic primary and was elected by a wide margin in November.

McGinty didn't return telephone messages seeking comment on Tuesday.

O'Malley said some of the prosecutors were new to the job, but he noted that a supervisor who resigned had been on the job for more than a decade.

The Juvenile Court's prosecutor's unit was previously run by Duane Deskins, who was hired last month by the city of Cleveland to lead an anti-violence program involving youths and young adults. Attempts to reach Deskins on Tuesday through a city spokesman were unsuccessful.

Deskins told Cleveland.com he couldn't respond to what O'Malley and his staff have uncovered without details from each case, but said he didn't know cases had been ignored and that there were two levels of supervisors who worked underneath him.

Subscribe to Home Delivery and SAVE!

SPONSORED CONTENT



**Inside this box could be the future of carbon capture: see it now.** ⬀

Providing more power for our growing world while capturing CO2 emissions. That's the...

SPONSORED BY  ExxonMobil

SPONSORED CONTENT



**Inside this box could be the future of carbon capture: see it now.** ⬀

Providing more power for our growing world while capturing CO2 emissions. That's the...

SPONSORED BY  ExxonMobil

SPONSORED CONTENT



**Inside this box could be the future of carbon capture: see it now.** ↗

Providing more power for our growing world while capturing CO2 emissions. That's the...

SPONSORED BY  ExxonMobil

**FROM AROUND THE WEB**
selected for you by a sponsor



One Thing All Liars Have in Common, Brace Yourself
*TruthFinder*



The Health Supplement Backed By Scientific Superstars
*Fast Company*



[Photos] Wife Gets Best Revenge On Her Cheating Husband
*Trend Chaser*



Type II Diabetes: Common Signs & Treatments
*Yahoo! Search*



These 4 Things Happen Right Before A Heart Attack {Watch}
*hearthealthytip.com*



[Gallery] 22 Years After O.J. Simpson's Acquittal, Faye Resnick Still Can't Let Go
*Monagiza*

**SPONSORED CONTENT**

Finally, a Protein Bar You Can Feel Good About Eating *Greatist*
Forget Yoga Pants. These Are What You Should Be... *Refinery29*
These Are The Best Health Insurance Plans Out Right Now *Yahoo! Search*
Ohio Homeowners Are Rushing To Claim Their $4,240... *The Better Finance*
Hire A Richfield Pro: The Best Solution For Your Small... *HomeAdvisor*
20 Absolutely Hilarious Christmas Decoration Fails *giveitlove*

**YOU MIGHT ALSO LIKE**

11-year-old girl drives SUV with adult in back, Ohio...
Recipe: Kindness cocktail
Lorain man accused of strangling woman
Remains found in Lorain County are missing Cleveland...
Avon's Levin Furniture property sells for $17.6 million
Ohio woman becomes second victim of tree-trimming...

**FROM AROUND THE WEB**
selected for you by a sponsor

Recommended by



One Thing All Liars Have in Common, Brace Yourself
*TruthFinder*

[Gallery] 20 Photos That Prove Nature Can Be Freakin' Scary
*Scribol*



[Gallery] 22 Years After O.J. Simpson's Acquittal, Faye Resnick Still Can't Let Go
*Monagiza*



[Photos] Wife Gets Best Revenge On Her Cheating Husband
*Trend Chaser*



When The Judge Read Out His Verdict, These Teens Started Crying Like Babies
*Scribol*



The Health Supplement Backed By Scientific Superstars
*Fast Company*

### SPONSORED CONTENT

[Gallery] Natalee Holloway's Story Finally Gets An… *HorizonTimes*

Ever look yourself up? This new site is addicting… *TruthFinder*

The Sweatshirt Designed by an Apple Engineer That's… *American Giant on Business Insider*

Forget Yoga Pants. These Joggers Are What You Should… *Refinery29*

If You Own A Home in Ohio You Can Now Claim Your $4… *The Better Finance*

Edmunds 25 Best SUVs of 2017 *Edmunds*

### YOU MIGHT ALSO LIKE

Lorain man accused of strangling woman

Fleeing car crashes into Ohio home, killing mother and…

Recipe: Kindness cocktail

11-year-old girl drives SUV with adult in back, Ohio…

LeBron gets stitches, scores 23 in fourth as Cavaliers…

Demolition begins for former Super K in Lorain

Recommended by

## Top Stories



### Lorain Councilman Arroyo charged with disorderly conduct



‹ ›



### Oberlin woman convicted in Amherst Township death seeks release



**HOVER FOR CIRCULAR**






**HOVER FOR CIRCULAR**






**HOVER FOR CIRCULAR**



**Join the Conversation**

View comments



Together, we are more than just fundraisers...
WE ARE THE HAND-RAISERS, THE GAME CHANGERS, THE STOP TALKING
AND START DOING TO TAKE ON THE IMPOSSIBLE TASKMASTERS.
And United we can do so much more.



- - <u>**MOST POPULAR**</u>

  <u>Day</u>
  <u>Week</u>
  <u>News</u>
  <u>Sports</u>
  <u>Biz</u>
  <u>A&E</u>
  <u>Email</u>
  <u>Life</u>

  - <u>Demolition begins for former Super K in Lorain</u>
  - <u>Rollover crash in Lorain leaves woman in critical condition</u>
  - <u>Shots fired from car in Elyria, two Lorain men arrested, police say</u>
  - <u>Shots fired into Lorain home</u>
  - <u>Tips for a safe and energy-efficient holiday season</u>
  - <u>Birth of Lorain Community Hospital remembered by one who was there</u>
  - <u>Lorain Councilman Arroyo charged with disorderly conduct</u>
  - <u>Taking a step back in time for the holidays in Amherst</u>

- **More videos:**



Stocker Arts Center

**Call 440-366-4040**
**for a complete season schedule**
**or visit**
**www.stockerartscenter.com**

Stocker Arts Center
*of Lorain County Community College*

1005 N. Abbe Rd., Elyria, Ohio 44035

Free Parking



Mike DeAnna
Broker

DEANNA REALTY
440-731-8070

Mike@Century21DeAnna.com

Each office is independently owned and

**CLICK HERE**

Century21DeAnna.com • 125 Hilliard Rd.,

# THE MORNING JOURNAL

## Current subscriber?

Take full advantage of your all access subscription!

**ACTIVATE**

# Statistics-driven system ignored child rape cases

**Tom Meyer , WKYC**    *6:29 PM. EST February 23, 2017*



*(Photo: WKYC-TV)*

CUYAHOGA COUNTY - Prosecutors in the office of Cuyahoga County Prosecutor Mike O'Malley are learning of new and disturbing details in what they are calling an outrageous handling of juvenile criminal cases.

"It's absolutely atrocious what's happened here," said Jennifer Driscoll, the assistant prosecutor in charge of investigating a couple thousand unprocessed cases involving juvenile crimes.

Driscoll said the juvenile justice unit under Duane Deskins placed a higher value on statistics than they did on justice for young victims of crime, including rape and other sexual assaults.

"It was a very stat-driven system and so stats and reports were very important.  And to have active cases lingering would look bad for the stats," Driscoll said.

Driscoll says that might explain why about 2,000 cases were classified 'inactive.'

These are cases that sat dormant collecting dust, and date back to 2013.

O'Malley says some of the cases would have been easy to pursue because suspects confessed. Instead, Driscoll says Deskins' staff did nothing and allowed sex offenders to walk the streets.

"Nothing else happened. Some suspects repeated offenses," Driscoll said.

Deskins left the office in December to take a reported $120,000 job at Cleveland City Hall. Mayor Frank Jackson appointed Deskins to lead an anti-violence program involving youths and young adults.

WKYC Channel 3 News tried to talk to Deskins twice, but each time was told that he was unavailable.

Deskins never returned phone calls. The Investigator Tom Meyer approached Deskins at the end of his work day at City Hall to ask questions on behalf of young victims of crime whose cases were ignored.

"We're not having this conversation," said an irritated Deskins.

The former county prosecutor wanted Meyer to check in with the city's spokesman on an issue that involved the county.

Deskins refused to answer any questions, including those involving 'inactive' cases which Driscoll says no longer exist in O'Malley's office.

"Once a case was marked inactive, it wasn't on anyone's radar," Driscoll explained.  "I think Deskins was charged with running a unit that allowed this to happen under him."

Mayor Jackson has acted as though nothing happened. He refused to talk on-camera and said through a spokesman that he had no response to the news involving Deskins.



PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

The spokesman said Jackson has no second thoughts about hiring Deskins.

The prosecutor's office has filed charges in 22 of the 54 sex assault cases initially identified.
Driscoll's team is still examining nearly 2000 cases and more charges are likely..

© 2017 WKYC-TV

## JOIN THE CONVERSATION

To find out more about Facebook commenting please read the
Conversation Guidelines and FAQs (http://$staticDomain/conversation-guidelines/)

## LEAVE A COMMENT ()

1                        C E R T I F I C A T E

2

3

      The State of Ohio, )    SS:
4     County of Cuyahoga.)

5

6           I, Chana Margareten, a Notary Public within
      and for the State of Ohio, authorized to
7     administer oaths and to take and certify
      depositions, do hereby certify that the
8     above-named witness was by me, before the giving
      of their deposition, first duly sworn to testify
9     the truth, the whole truth, and nothing but the
      truth; that the deposition as above-set forth was
10    reduced to writing by me by means of stenotypy,
      and was later transcribed by computer-aided
11    technology under my direction; that this is a
      true record of the testimony given by the
12    witness; that said deposition was taken at the
      aforementioned time, date and place, pursuant to
13    notice or stipulations of counsel; that I am not
      a relative or employee or attorney of any of the
14    parties, or a relative or employee of such
      attorney or financially interested in this
15    action; that I am not, nor is the court reporting
      firm with which I am affiliated, under a contract
16    as defined in Civil Rule 28(D).

17          IN WITNESS WHEREOF, I have hereunto set my
      hand and seal of office, at Cleveland, Ohio, this
18    _5_ day of _September_, A.D. 20 _19_.

19

20    _____
      Chana Margareten, Notary Public, State of Ohio
21    55 Public Square, Suite 1332
      Cleveland, Ohio 44113
22    My commission expires March 10, 2021

23

24

25